SUN MEDIA SYSTEMS,
INC., Plaintiff,

v.

KDSM, LLC and Sinclair Broadcast
Group, Inc., Defendants.

No. 4:06–cv–106.

United States District Court,
S.D. Iowa,
Central Division.

July 1, 2008.

Trent C. Keisling, Meredith K. Lowry, Stephen Douglas Schrantz, John M. Scott, Keisling Pieper & Scott PLC, Fayetteville,

AR, Eric F. Turner, Turner Law Offices, West Des Moines, IA, for Plaintiff.

Michael J. Collins, Michael S. Libowitz, Thomas & Libowitz PA, Baltimore, MD, J. Campbell Helton, Whitfield & Eddy, PLC, Des Moines, IA, for Defendants.

## ORDER

ROBERT W. PRATT, Chief Judge.

Before the Court is Defendants' Motion for Summary Judgment, filed November 1, 2007. Clerk's No. 54. Plaintiff filed a resistance to the motion on November 26, 2007 (Clerk's No. 60), and Defendants replied on December 28, 2007. Clerk's No. 71. A hearing was held on March 25, 2008. Clerk's No. 83. The matter is fully submitted.

## I. FACTUAL BACKGROUND

Defendant Sinclair Broadcast Group, Inc. ("Sinclair") is a Maryland corporation that, through its subsidiaries and affiliates, owns, operates, programs and/or provides sales services to fifty-eight television stations in thirty-six markets throughout the United States. Defs.' Statement of Material Facts ¶ 1. Defendant KDSM, LLC ("KDSM") is a Sinclair subsidiary that owns, operates, programs, and/or provides sales services to the Des Moines, Iowa television station KDSM Fox 17. *Id.* ¶ 2; Pl.'s Response to Defs.' Statement of Material Facts ¶ 2. Plaintiff Sun Media Systems, Inc. ("Sun Media" or "Plaintiff")[1] is an Arkansas corporation that is in the business of conducting direct mail promotions in the broadcast industry. Defs.' Statement of Material Facts ¶ 3.

In 1999, Sun Media sued Comcast Cablevision of Little Rock, Inc. and Comcast Cable Communications, Inc. (collectively "Comcast") in the United States District Court for the Eastern District of Arkansas, alleging copyright infringement, fraud, and deceit. During that litigation, Sun Media filed its manual, entitled "Sales Person's Guide to Success!" with the court. *Id.* ¶ 4. The manual was not identified as a confidential document and it was not filed under seal.[2] *Id.* On or about January 29, 2001, Michael Rosen and James Tandy ("Tandy"),[3] two Sun Media employees, met with Sinclair employees to present their business concept of conducting direct mail promotions in the broadcast industry. *Id.* ¶ 5. According to Sinclair and KDSM (collectively referred to as "Defendants"), Sun Media explained its entire business concept in explicit detail, without any written or oral confidentiality agreement. *Id.* Sun Media denies this assertion, claiming that it required a confidentiality agreement be-

---

1. Sun Media was originally incorporated under the name "Press Promotions, Inc.," but changed its name in 2002. Defs.' Statement of Material Facts ¶ 3. The Court will refer to "Press Promotions, Inc." as Sun Media throughout this Order.

2. Sun Media does not expressly admit that its manual was not identified as a confidential document or filed under seal in the Arkansas litigation. Local Rule 56, however, provides: "A response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that sup-

port the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record. *The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact."* L.R. 56 (emphasis added).

3. Tandy is the sole shareholder of Sun Media. Defs.' Statement of Material Facts ¶ 5. The pleadings in this case make clear that, for all practical purposes, Tandy *is* Sun Media. The Court makes frequent reference to Tandy throughout this case and uses his name interchangeably with "Sun Media" and "Plaintiff."

fore divulging proprietary material, and pointing out that it could not divulge its trade secrets in the limited amount of time typically allotted for an initial presentation. Pl.'s Response to Defs.' Statement of Material Facts ¶ 5.

On or about May 3, 2001, Sinclair Media II, Inc. (a separate entity from Sinclair) engaged Sun Media to conduct a direct mail advertising campaign for one of its stations in the Las Vegas, Nevada television market. Defs.' Statement of Material Facts ¶ 6. In approximately July 2001, various Sinclair affiliated companies engaged Sun Media to conduct campaigns for television stations in Kansas City, Missouri, and in Oklahoma City, Oklahoma.[4] *Id.* ¶ 7. In December 2001, additional Sinclair affiliates in Winston Salem, North Carolina, Raleigh, North Carolina, and Des Moines, Iowa (KDSM) engaged Sun Media to conduct advertising campaigns as well. *Id.* Sinclair asserts that it was not a party to any of these contracts between Sun Media and the Sinclair affiliates.[5] *Id.*

In the KDSM contract with Sun Media, there is a section entitled "Terms and Conditions," which contains the following confidentiality clause:

> Client hereby acknowledges that any marketing, sales, promotional or production information, manuals, customer lists, artwork, methods of operation or material it may acquire from [Sun Media] in the performance of or in connection with or as a result of this Agreement are [Sun Media] trade secrets and Client agrees not to divulge any of [Sun Media's] trade secrets to any third party whatsoever without [Sun Media's] written permission. Client acknowledges the ongoing nature of the business contemplated by the Agreement and agrees that it will not use any of [Sun Media's] trade secrets, trademarks, trade names or marks or symbols descriptive thereof for any purpose whatsoever after the expiration of this Agreement.

*Id.* ¶ 8; Defs.' App. at 94. Sun Media admits that it does not have any written trade secrets, but asserts that it previously had written trade secrets in its 2002 manuals and in other proprietary material. Pl.'s Response to Defs.' Statement of Material Facts ¶ 9.

In 2002, KDSM utilized Sun Media as a vendor to assist it with direct mailers for use in conjunction with its local television advertising campaign. Defs.' Statement of Material Facts ¶ 10. In May 2002, a direct mailer (the "KDSM Spring 2002 Mailer") was mailed to the public. *Id.* ¶ 11. While Defendants assert that the KDSM Spring 2002 Mailer was "in large part created and put together by KDSM," Sun Media argues that the KDSM Spring 2002 Mailer was a "joint effort" between KDSM and Sun Media. *Id.* ¶ 12; Pl.'s Response to Defs.' Statement of Material Facts ¶ 12. Specifically, Sun Media contends that it "provided guidance in the creation of the mailer and provided copyrighted materials

---

4. Sun Media denies that the contracts were entered into on or about July 23, 2001. It does not, however, provide any citation to the record to support its denial, as required by Local Rule 56. Accordingly, the date is deemed admitted.

5. Sun Media denies that Sinclair was not a party to the listed contracts, "as Sinclair's employees executed these contracts." Sun Media cites Defendants' Appendix pages 1114–15 in support of its denial. The cited pages, however, do not support a conclusion that Sinclair was, in fact, a party to the contracts. Indeed, the cited material is the Affidavit of Barry Faber, the Vice President and General Counsel of Sinclair. Mr. Faber specifically states in his affidavit that Sun Media was "engaged by ... Sinclair affiliated television stations" and that "Sinclair was not a party to these contracts." Defs.' App. at 1115.

that assisted in the production and layout of the KDSM Spring 2002 Mailer." Pl.'s Response to Defs.' Statement of Material Facts ¶ 12. Sun Media also claims that it provided assistance with the mailer's cover design, contest pages, layout, and by providing guidance about obtaining advertisements, amongst other things. *Id.* There is no dispute, however, that the KDSM Spring 2002 Mailer was not registered with the United States Copyright Office. Defs.' Statement of Material Facts ¶ 13. In addition to the KDSM Spring 2002 Mailer, a PowerPoint presentation was developed (the "KDSM Spring 2002 Presentation"), as an element of the direct mail aspect of the local television advertising sales campaign.[6] *Id.* ¶ 14.

In 2002, Sun Media was engaged by more Sinclair affiliated stations to assist with direct mailers for use in conjunction with each station's local television advertising campaigns.[7] *Id.* ¶ 15. Sinclair again claims that it was not a party to any of its affiliates' contracts with Sun Media.[8] *Id.* None of the mailers prepared during the 2002 period were registered with the United States Copyright Office. *Id.* In February 2003, Sinclair and Sun Media began discussing plans for a Fall 2003 direct mail campaign for various Sinclair markets. *Id.* ¶ 16. Sun Media drafted proposed contracts for the individual stations that would be taking part in this campaign. *Id.* The contracts were dated February 10, 2003, but were never executed by either the individual stations or by Sinclair, because a dispute had arisen between Sinclair and Sun Media concerning the right of Sinclair's affiliate stations to conduct their own local television advertising sales using direct mail as an inducement for potential advertisers to advertise with the affiliate stations. *Id.* On April 1, 2003, James Tandy, as President of Sun Media, wrote a letter to Sinclair, providing in pertinent part:

> I am sending you this today via e-mail because as of this time you [have] not returned my attorney's call. And, because I feel that we must get the fall program situation settled.

> I appreciate the pressures which revolve around the broadcast industry today and especially around your position. I also understand the need to be as flexible as possible to take advantage of market opportunities. I enjoy Sun Media's relationship with you and your company and want to do everything possible to continue to make that partnership work. We are completing your spring promotion at this time and I think it has been a huge success.

> However, with regards to the fall promotion, my comptroller, my finance manager, my intellectual attorney, and

---

6. The KDSM Spring 2002 Presentation was also not registered with the United States Copyright Office. Defs.' Statement of Material Facts ¶ 14. Sun Media asserts that it created the KDSM Spring 2002 Presentation. Pl.'s Response to Defs.' Statement of Material Facts ¶ 14. The appendix citation does not, however, support this contention.

7. The markets include Asheville, NC; Baltimore, MD; Birmingham, AL; Buffalo, NY; Cape Girardeau, MO; Charleston, WV; Cincinnati, OH; Columbus, OH; Dayton, OH; Indianapolis, IN; Johnson City, TN; Kansas City, KS; Las Vegas, NV; Lexington, KY; Nashville, TN; Norfolk, VA; Oklahoma City, OK; Pittsburgh, PA; Raleigh, NC; Rochester, NY; San Antonio, TX; and Winston Salem, NC. Defs.' Statement of Material Facts ¶ 15; Pl.'s Response to Defs.' Statement of Material Facts ¶ 15.

8. Sun Media again denies that Sinclair was not a party to the listed contracts, "as Sinclair's employees executed these contracts." Sun Media cites Defendants' Appendix pages 1114–15 in support of its denial. The cited pages, however, do not support a conclusion that Sinclair was, in fact, a party to the contracts. *See supra* note 5.

my corporate attorney are all over me to make sure that I do not diminish or weaken our major asset which is our system/sequence—our copyrights. . . .

If you choose to stay with us in 2004, we will be most happy. If you choose to take the program in-house, fine. Develop your own system and have at it. We just need to protect our assets. We have experience in these "in-house" situations and they have suffered loss of revenue levels and found the programs to be dismal failures. . . .

Sun Media devised and developed an original direct mail campaign for use by broadcast media. I am obligated to protect any of its copyrighted materials involved in its system/sequence including its step-by-step proprietary programs, manuals, time lines, invitations, presentation packages, direct mail/on-air audience contest, production sources and techniques, sales advertising report, software packages, and direct mail target area compilation program. . . .

Let's get the fall done—we all have commitments—then let's talk about the future.

*Id.* ¶ 17; Defs.' App. at 397–98. Three days later, on April 4, 2003, Sun Media entered into the following letter agreement (the "April 2003 Letter Agreement") with Sinclair regarding its services:

This will confirm that [Sinclair] has agreed to go forward with [Sun Media] as the provider of the printing and distribution services for the direct mailpieces that the Sinclair stations listed on exhibit A [9] to this letter plan to undertake during the fall of 2003. As you are aware, we will not be signing a formal contract with regard to this engagement because we have been unable to agree on a number of the provisions to be contained in a contract. Notwithstanding that, this letter agreement shall constitute a binding contract and the parties agree that their rights and obligations with respect to the mechanics of performing the direct mail promotion and the financial responsibilities/payments associated therewith shall be provided in a manner consistent with the provisions of such rights, obligations and responsibilities/payments during [Sun Media's] retention by Sinclair stations for similar promotions/payments during the spring of 2003, including (without limitation) the right of any station to cancel such direct mail efforts in the event certain revenue projections are not met and in that event to pay [Sun Media] only a $5,000 fee.

As we have discussed, chief among the disagreements between [Sun Media] and Sinclair is the extent of the right of Sinclair to undertake direct mail/promotions on its own and/or with vendors other than [Sun Media] providing a similar service. Although Sinclair is prepared to agree that [Sun Media] has certain rights in its trade names, we disagree with [Sun Media's] contention that it also has rights in any processes associated with the services provided or with such elements of the direct mail/promotion as a launch breakfast, two-for-one specials or similar aspects of the manner in which these promotions have been undertaken in the past. Accordingly, nothing in this letter agreement or as a result of our engagement of [Sun Media] for the fall of 2003 is in any

---

**9.** The markets listed in Exhibit A are: Columbus, Baltimore, Pittsburgh, Minneapolis, Charleston, WV, Richmond, Norfolk, Syracuse, San Antonio, Sacramento, Milwaukee, St. Louis, Madison, Oklahoma City, Las Vegas, Kansas City, Asheville, Dayton, Raleigh, Nashville, Birmingham, Cincinnati, Lexington, Greensboro, Charleston, SC, Tri–Cities, Springfield/Champaign, Tallahassee, Rochester, and Pensacola. Defs.' App. at 401.

way intended to waive any rights Sinclair may have to engage in such actions. Neither shall this letter agreement or the engagement of [Sun Media] waive any rights [Sun Media] may claim to have to any trademarks, trade names or similar intellectual property.

If the foregoing accurately reflects our agreement, please indicate so by signing this document in the space indicated below and returning it to me. The offer to engage [Sun Media] contained in this letter agreement will be withdrawn and of no further force and effect if such counter-signed copy has not been received by Sinclair by 5:00 p.m. eastern time on Monday, April 7, 2003.

Defs.' Statement of Material Facts ¶ 18; Defs.' App. at 399–400. James Tandy executed the April 2003 Letter Agreement on April 4, 2003. Defs.' App. at 400. Sinclair argues that the April 2003 Letter Agreement did not include any clause regarding trade secrets. Defs.' Statement of Material Facts ¶ 18. Sun Media, on the other hand, denies that the April 2003 Letter Agreement did not contain such a clause, pointing to the language of the agreement where the "parties agree that their rights and obligations with respect to the mechanics of performing the direct mail promotion and the financial responsibilities/payments associated therewith shall be provided in a manner consistent with

the provisions of such rights, obligations and responsibilities/payments during [Sun Media's] retention by Sinclair stations for similar promotions/payments during the spring of 2003." Sun Media argues that this language encompasses the trade secret clause included in the Spring 2003 contracts, which clause is identical to that in the December 2001 contract between KDSM and Sun Media.[10]

Subsequent to the execution of the April 2003 Letter Agreement, Sun Media conducted advertising campaigns for the markets identified in the agreement. Of the thirty markets, twenty-three had previously had formal agreements with Sun Media in 2001 or 2002, while the other seven had never had any contract with Sun Media at all.[11] Sun Media did not provide services related to a direct mail campaign for KDSM during 2003. According to Defendants, KDSM was dissatisfied with Sun Media's efforts, and elected to bring its direct mail program in-house, and to develop its own local television sales campaign. *Id.* ¶ 21. KDSM prepared a direct mailer and mailed it to the public, though Sun Media claims that KDSM simply "reused a presentation prepared by Sun Media and created a mailer that was substantially similar to Sun Media's copyrighted mailers." *Id.;* Pl.'s Response to Defs.' Statement of Material Facts ¶ 21.

---

**10.** *See supra* pages 950–51 for the specific language of the KDSM clause.

**11.** Specifically, the Springfield/Champaign, Madison, Milwaukee, Sacramento, St. Louis, Syracuse, and Tallahassee markets had never had formal contracts with Sun Media. Defs.' Statement of Material Facts ¶ 19. Defendants argue that any alleged oral trade secrets conveyed to these stations "was done so without any corresponding obligation, contractual or otherwise, for these stations to keep any alleged trade secrets confidential and secret." *Id.* ¶ 19. Sun Media maintains that these

markets were, nonetheless, bound by a confidentiality clause, since the April 2003 Letter Agreement expressly provided that "the parties agree that their rights and obligations with respect to the mechanics of performing the direct mail promotion ... shall be provided in a manner consistent with the provisions of such rights, obligations and responsibilities/payments during [Sun Media's] retention by Sinclair stations for similar promotions/payments during the spring of 2003," given that the referenced 2003 formal contracts contained a confidentiality clause.

By July 2003, Sinclair and Sun Media were discussing plans for a Spring 2004 direct mail campaign for various Sinclair markets. On July 10, 2003, Dennis B. Haase, intellectual property counsel for Sun Media, sent a letter to Sinclair, stating in pertinent part:

As you are aware, Sun Media is the copyright proprietor of several registrations.... Neither Sun Media, nor its predecessor, claim to have excised from the channels of commerce all direct mailing programs and media promotions. They have, however, devised and developed a system uniquely targeted to the needs of media outlets in their efforts to increase market share and their bottom line. That system, which I am sure you will concede, has enjoyed unparalleled success in accomplishing its goals, is, for the most part, embodied in the various copyrights. Some aspects of the system are, and remain, as trade secret within Sun Media and are not discernable in the copyrighted works. However, the total package has a certain rhythm and flow, which has not been successfully duplicated by others, although they have certainly tried. Sun Media has every intention of protecting its position in this market.

Defs.' App. at 402–03. On July 21, 2003, James Tandy sent another letter to Sinclair, on behalf of Sun Media, providing:

I have indeed registered copyrights on everything we do including, our name, the mail pieces, the invitation, the manual, the sales presentation, Check Us Out Sweepstakes—contesting as a means of selling advertising, as well as an audience promotion, the telemarketing scripts, the kickoff agenda, sales advertising reports [SAR], timelines, etc. More importantly we have registered the sequence, which allows for a systematic approach to selling television and

delivering a direct mail piece. I was there on the first presentation to Barry Drake and Sinclair and I have been to most of your markets, some many times. I can assure you that before we supplied your stations with proprietary materials and on-site training, they did not know how to do what we trained them to do. The initial organizational effort, what we call "accelerated prospecting", was absolutely introduced to your stations by Sun Media. You can argue with me that nothing we do is revolutionary or new and be reasonably accurate. Intellectual lawyer language beyond that is so complex as to be confounding to understand or quantify. The example you gave me, I know it when I see it, is pretty good. However, I can say without hesitation that the way we put our system together is absolutely unique and no one has figured out how to do it. I am obligated to protect our assets.

*Id.* at 404–05. On July 31, 2003, Sinclair sent Sun Media a letter wherein it proposed "to commit to place certain business with Sun Media if we can come to an agreement regarding certain rights Sun Media believes it has in portions of the services it provides to its clients." *Id.* at 408. Specifically, Sinclair offered to utilize Sun Media's services in at least fifteen markets for selling direct mail/broadcast advertising for the May 2004 sweeps period, if Tandy, on behalf of Sun Media, executed a letter providing as follows:

I understand that in the future some or all of the television stations owned by subsidiaries of Sinclair Broadcast Group may engage without the assistance of Sun Media in the sale of advertising packages using a combination of broadcast and direct mail (which may include magazine style compilation of ads and promotions).

This letter is to confirm that Sun Media does not believe that it owns the exclusive right to undertake this type of advertising sales and that the Sinclair stations do not have any obligation to use the services of Sun Media to make these sales. In addition[,] Sun Media does not claim to have any right to prohibit the Sinclair stations from holding sales meetings involving meals and/or door prizes as a means of making sales presentations or from using oral and/or written invitations to invite prospective advertisers to such sales presentations. Finally, Sun Media does not claim any exclusive right to including "watch and win" style contests as on-air means of promoting the distribution of the direct mail pieces and promoting viewership of certain television programming.

Sun Media does, however, have protectable interests in the specific language used previously by certain Sinclair stations in (a) invitations, (b) sales solicitation scripts and (c) in-person presentation scripts. Accordingly, Sun Media expressly reserves the right to take action to preserve its rights in the event any Sinclair station infringes on these specific rights.

*Id.* at 410. On July 31, 2003,[12] in response to Sinclair's proposal, Sun Media faxed Sinclair a letter on Sun Media letterhead (the "July 29, 2003 Letter").[13] *Id.* at 412. The first two paragraphs of the letter are identical to those proposed by Sinclair.

The third paragraph varied slightly, providing:

Sun Media does, however, have protectable interest in the nature of registered copyrights and specific language used previously by certain Sinclair stations in (a) invitations (b) sales solicitation scripts (c) in person presentation scripts (d) manuals (e) proprietary materials supplied to Sinclair by Sun Media in local markets for their exclusive use and (f) the name "Check Us Out Sweepstakes." Accordingly, Sun Media expressly reserves the right to take action to preserve its rights in the event any Sinclair station infringes on these specific rights.

*Id.* at 412.

In light of what Sinclair perceived as Sun Media's concession regarding its intellectual property rights, the parties executed another Letter Agreement on August 26, 2003 (the "August 2003 Letter Agreement") regarding the direct mail campaigns to take place in Spring 2004. The August 2003 Letter Agreement provided:

This will confirm that [Sinclair] has agreed to go forward with [Sun Media] as the provider of the printing and distribution services for the direct mailpieces for the Sinclair stations listed on exhibit A [14] (the "Stations") to this letter plan to undertake during March and May of 2004 (the "March/May Program"). This letter agreement shall

---

**12.** Presumably, Sinclair faxed or e-mailed its letter to Plaintiff on July 31, 2003, since Plaintiff responded the same day.

**13.** The letter was incorrectly dated July 29, 2003.

**14.** The markets listed in Exhibit A are: Buffalo, Minneapolis, Rochester, Charleston, WV, Richmond, Norfolk, Tallahassee, Syracuse, Pensacola, St. Louis, Springfield/Champaign, Asheville/Greenville, Dayton, Raleigh, Nash-

ville, Birmingham, Cincinnati, Lexington, Greensboro, Charleston, SC, Tri Cities, and Oklahoma City. Defs.' App. at 415. Springfield, Champaign, St. Louis, Syracuse, and Tallahassee never had a prior formal contract with Sun Media. Defs.' Statement of Material Facts ¶ 28. Those five affiliate stations did, however, receive services from Sun Media pursuant to the April 2003 Letter Agreement. Pl.'s Response to Defs.' Statement of Material Facts ¶ 28.

constitute a binding contract and the parties agree that, subject to the other terms of this letter agreement, their rights and obligations with respect to the mechanics of performing the direct mail promotion and the financial responsibilities/payments associated therewith shall be provided in a manner consistent with the provisions of such rights, obligations and responsibilities/payments during [Sun Media's] retention by Sinclair stations for similar promotions/payments during the spring and fall of 2003, including (without limitation) the right of any station to cancel such direct mail efforts in the event certain revenue projections are not met and in that event to pay [Sun Media] only a $5,000 fee.

The Stations currently intend to conduct direct mail programs during 2004 in addition to the March/May Program. Although Sun Media will be considered as a provider of services for such additional programs, the Stations have no obligation to so use Sun Media other than for the March/May Program. In addition, in the event any advertisers are sold packages that include elements of both the March/May Program, on the one hand, and any other programs, on the other hand, for purposes of determining the payment due Sun Media for its services on the March/May Program, Sinclair will allocate in good faith the revenue received from any such advertisers between all such programs.

As you are aware, Sun Media and Sinclair previously had a disagreement regarding the intellectual property rights that Sun Media has in the services that it has provided to Sinclair in the past. This disagreement was resolved in accordance with the letter from Sun Media dated July 29, 2003 (but delivered July 31, 2003). The relationship between Sun Media and Sinclair insofar as it relates to intellectual property rights shall continue to be governed by the terms of the July 29, 2003 letter from Sun Media (and not by any provisions on this topic included in any prior contract between Sinclair and Sun Media). In addition, nothing in this letter agreement shall limit the rights and obligations of Sinclair and Sun Media set forth in the July 31, 2003 letter from Sinclair to Sun Media.

If the foregoing accurately reflects our agreement, please indicate so by signing this document in the space indicated below and returning it to me.

*Id.* at 413–14. James Tandy executed the August 2003 Letter Agreement on or about August 26, 2003. Defs.' Statement of Material Facts ¶ 25.

On January 13, 2004, Sun Media and Sinclair executed another letter agreement (the "License Agreement"), which provided:

This will confirm that [Sun Media] and [Sinclair] and their affiliates, have each granted the other the perpetual non-exclusive right to place in any direct mail piece (or related product) with which they are involved, any advertisement (or derivation thereof) which previously appeared in a mailer used by one of Sinclair's television stations, with respect to which Sun Media was providing services, without violating any intellectual property right of either Sinclair or Sun Media. Nothing in this letter agreement shall serve as a representation or warranty by either Sinclair or Sun Media with respect to ownership rights, if any, in any such advertisement by any other party (including, without limitation, the party placing such advertisement).

Defs.' App. at 416. Following the July 2003 Letter Agreement, the August 2003 Letter Agreement, and the License Agree-

ment, several Sinclair affiliates developed in-house direct mailers to supplement their local sales television advertising solicitations.[15] Defendants deny that Sinclair or its affiliated stations used Sun Media invitations, sales solicitation scripts, in person presentation scripts, the name "Check Us Out Sweepstakes," or any other proprietary materials provided by Sun Media in these direct mail campaigns, though Sun Media disputed this contention. Defs.' Statement of Material Facts ¶ 30; Pl.'s Response to Defs.' Statement of Material Facts ¶ 30. Thus, on September 16, 2004, Tandy sent Sinclair a letter stating that he had "carefully reviewed [ ] concerns about Sinclair's use of [Sun Media's] assets, its copyrights" and stating, "[Sun Media] takes the designs of its system very seriously. . . . I feel that you have copied and made commercial use of our system. Per paragraph three of my letter to Jeff Sleete on July 29, 2003, you have infringed on our specific rights." Defs.' App. at 417. On October 1, 2004, Tandy sent a letter to Sinclair stating:

> In the past, our conversations have centered on our copyrights as an asset and our need to protect them. Our total sequence is protected and specifically outlined in our "Managers Guide to Success." Also, our contracts protect our trade secrets. I thought, per our conversations, that your instructions to your in-house producer were to create your own presentation.
>
> What we have experienced is a continuation of our sequence. Plus, the mailer is the same size, same format, same weight, etc. Words in the sales presentations are taken from our presentations. Plus, many of your markets continue to use our graphics. I know that

we had a discussion about placement of advertisements in your markets. I noted that since I was working with you in several markets that it was okay and only made sense to continue a good relationship. When you sent me a fax with an agreement I had a disagreement with the use of the word perpetual as that was not mine or my attorney's intent. By producing a substantial copy of our system, you are infringing on our copyrights.

*Id.* at 418.

On or about March 16, 2006, Sun Media filed a Complaint in the present action. Clerk's No. 1. Sun Media filed an amended complaint on December 8, 2006 (Clerk's No. 23), and filed a second amended complaint on August 21, 2007. Clerk's No. 40. In the Second Amended Complaint, Sun Media asserts the following four claims: 1) copyright infringement against both Defendants; 2) breach of contract against KDSM; 3) misappropriation of trade secrets against KDSM; and 4) misappropriation of trade secrets against Sinclair. *Id.*

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.; see also Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990). "[S]ummary judgment is

---

**15.** Sun Media aptly points out, however, that Sinclair's Des Moines affiliate, KDSM conducted an "in-house" direct mail campaign before any of the Letter Agreements, in May 2003. Pl.'s Response to Defs.' Statement of Material Facts ¶ 30.

an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is not " 'to cut litigants off from their right of trial by jury if they really have issues to try,' " *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379,

382 (8th Cir.1994). The court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.").

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See* Fed. R.Civ.P. 56(c), (e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### III. LAW AND ANALYSIS

Defendants assert several arguments in support of their Motion for Summary

Judgment. In particular, Defendants argue: 1) the parties settled any dispute regarding alleged copyrights and trade secrets; 2) Sun Media does not possess any trade secrets; 3) Sun Media's alleged "system/sequence" is not copyrightable; 4) Sun Media did not properly register its works prior to bringing suit; 5) the "License Agreement" granted Sinclair and its affiliates the right to use any "mailing advertisements"; 6) the mailers, presentations, and manuals are not copyrightable because they are not original; 7) Sun Media cannot establish that Defendants infringed on its alleged copyrighted materials; and 8) Sun Media has not proven a breach of contract against KDSM. The Court will address each argument in turn.

### A. Did the Parties Previously Settle all Disputes Regarding Copyrights and Trade Secrets?

Defendants argue that the Letter Agreements, specifically the August 2003 Letter Agreement, settled all disputes between the parties over copyright and trade secret issues. Specifically, Defendants argue that the August 2003 Letter Agreement resolved all past and present claims by Sun Media regarding intellectual property rights, and that it expressly limited Sun Media's intellectual property claims to "those 'protectable interests in the nature of registered copyrights and specific language' used in materials like invitations and sales scripts previously supplied to Sinclair's stations for their 'exclusive' use." Defs.' Br. at 13.

■ "Settlement agreements are essentially contracts, and general principles of contract law apply to their creation and interpretation." *Sierra Club v. Wayne Weber LLC*, 689 N.W.2d 696, 702 (Iowa 2004). The general rules of contract interpretation provide that the intent of the parties in creating the contract controls. *Id.; see also Smith Barney, Inc. v. Kee-*ney, 570 N.W.2d 75, 78 (Iowa 1997). Unless there is an ambiguity, the intent of the parties is determined by what the contract itself says. *Smith Barney, Inc.,* 570 N.W.2d at 78 (citing *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862 (Iowa 1991)). "A contract is to be interpreted as a whole, and it is assumed in the first instance that no part of it is superfluous." *Id.* (citing *Iowa Fuel*, 471 N.W.2d at 863). "The interpretation that gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation that leaves a portion of the agreement of no effect." *Id.* (citing *Iowa Fuel*, 471 N.W.2d at 863).

In interpreting a contract, the Court must engage in a two step process. *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001). "First, from the words chosen, a court must determine 'what meanings are reasonably possible.'" *Id.* (quoting Restatement (Second) of Contracts § 202 cmt. a, at 87 (1981)). "In so doing, the court determines whether a disputed term is ambiguous." *Id.* The question of whether a term is ambiguous will not be determined by the mere fact that the parties disagree about its meaning. *Id.* (citing *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999)). Rather, a term is ambiguous if, " 'after all pertinent rules of interpretation have been considered,' 'a genuine uncertainty exists concerning which of two reasonable interpretations is proper.'" *Id.* (quoting *Hartig Drug Co.*, 602 N.W.2d at 797).

■ Defendants contend that the August 2003 Letter Agreement "specifically resolve[d] any dispute between the parties concerning Sun Media's intellectual property claims, *past and present.*" Defs.' Br. at 13. Plaintiff counters that KDSM was not a party to the August 2003 Letter Agreement, and that the letter agreement absolutely did not waive any accrued

claims that Sun Media may have had. The Court finds that the Agreement did resolve some, but not all, disputes between the parties.

Plaintiff is correct that KDSM is not a party to the August 26, 2003 Letter Agreement per se. *See* Defs.' App. at 413 ("This will agree that *Sinclair Broadcast Group, Inc.* ("Sinclair") has agreed to go forward.... Sun Media and *Sinclair* previously had a disagreement.... The relationship between Sun Media and *Sinclair* insofar as it relates to intellectual property rights...."). However, the plain language of the August 2003 Letter Agreement specifically incorporates the July 29, 2003 letter from Sun Media to Sinclair as governing the relationship between Sinclair and Sun Media on the topic of intellectual property rights. *See* Defs.' App. at 414 ("The relationship between Sun Media and Sinclair insofar as it relates to intellectual property rights shall continue to be governed by the terms of the July 29, 2003 letter from Sun Media (and not by any provisions on this topic included in any prior contract between Sinclair and Sun Media)."). The July 29, 2003 letter necessarily includes KDSM as a party. *See id.* at 412 ("I understand that in the future *some or all of the television stations owned by subsidiaries of Sinclair Broadcast Group* .... Sinclair *stations* do not have any obligation to use the services of Sun Media to make these sales. In addition SunMedia does not claim to have any right to prohibit the *Sinclair stations* ...."). Thus, the Court finds that the plain language of the August 2003 Letter Agreement, combined with the language of the July 29, 2003 Letter, incorporated into the agreement by reference, bars Plaintiff from pursuing claims against *either* KDSM or Sinclair or Sinclair affiliates for: 1) "engaging without the assistance of Sun-Media in the sale of advertising packages using a combination of broadcast and direct mail"; 2) "holding sales meetings involving meals and/or door prizes as a mean of making sales presentations"; 3) "using oral and/or written invitations to invite prospective advertisers to such sales presentations"; 4) and "including 'watch and win' style contests as on-air means of promoting the distribution of the direct mail pieces and promoting viewership of certain television programming."

The Court further finds that, with respect to Sinclair, KDSM, and all Sinclair affiliates, Plaintiff expressly reserved its right to pursue legal action when Plaintiff believes those entities have infringed on: "registered copyrights and specific language used previously by certain Sinclair stations in (a) invitations (b) sales solicitation scripts (c) in person presentation scripts (d) manuals (e) proprietary materials supplied by Sinclair by Sun Media in local markets for their exclusive use and (f) the name 'Check Us Out Sweepstakes.'" *Id.* at 412. To the extent that Plaintiff maintains any right to pursue legal action against Sinclair or any of its affiliates, including KDSM, for other perceived infringements, the Court concludes that it may, because the August 2003 Letter Agreement and the July 29, 2003 Letter do not purport to cover any topics other than those expressly listed.[16] More-

---

**16.** Defendants would have the Court read the passage, "The relationship between Sun Media and Sinclair insofar as it relates to intellectual property rights shall continue to be governed by the terms of the July 29, 2003 letter" as implying that the *"only* intellectual property rights belonging to Sun Media" are those it expressly reserved in the July 29, 2003 Letter. The fact remains, however, that the August 2003 Letter Agreement does not use such restrictive language. Indeed, neither the August 2003 Letter Agreement nor the July 29, 2003 Letter attempt to make any

over, the Court cannot read the August 2003 Letter Agreement as settling any accrued claim between KDSM and Sun Media, save for Sun Media's detailed listing disavowing claims for "Sinclair stations" using breakfast meetings, door prizes, watch and win sweepstakes, etc. Thus, to the extent that Plaintiff is asserting claims against either Defendant for the general categories listed as barred above, summary judgment in favor of Defendants is proper. To the extent that Plaintiff has asserted other claims, falling outside the boundaries of such "barred" claims, summary judgment is not proper.

### B. *Does Sun Media Have any Trade Secrets?*

In Count III of Plaintiff's Second Amended Complaint, Sun Media asserts that it has "created many valuable marketing and advertising strategies that it maintains as trade secrets," that it has "taken reasonable steps necessary to protect its trade secrets from disclosure to outside parties," and that such trade secrets are "commercially valuable property." Second Am. Compl. ¶¶ 92–94. Sun Media claims that it disclosed these trade secrets to KDSM in confidence, and pursuant to a confidentiality clause, and that KDSM misappropriated those trade secrets and willfully and wrongfully disclosed them to Sinclair in violation of the contract between KDSM and Sun Media. *Id.* ¶¶ 96–103. In Count IV of Plaintiff's Second Amended Complaint, Sun Media makes largely the same allegations against Sinclair, asserting that Sinclair obtained the trade secrets wrongfully through its affiliate stations, and used them despite knowing that it had no right to do so. *Id.* ¶¶ 106–19.

Defendants claim that they attempted for months to clearly identify what information Sun Media was claiming constituted a "trade secret" under the Iowa Uniform Trade Secrets Act ("IUTSA"), Iowa Code § 550.1 et seq., which provides that "an owner of a trade secret is entitled to recover damages for the misappropriation" of that trade secret. *See* Iowa Code § 550.4; Defs.' Br. at 17. In response to Defendants' first set of interrogatories, asking Sun Media to "[d]escribe in detail all trade secrets belonging to Sun Media that you allege were disclosed to the Defendants," Sun Media responded:

> Sun Media objects to this Interrogatory to the extent it requests privileged [information and] on the basis that the information being requested is both proprietary and confidential material. However, without providing detail, when Sun Media presents and installs its system as shown in the manuals, the sequence of events is very important. Various steps are guided by Sun Media to elicit a successful direct mail campaign....

Defs.' App. at 420–21.[17] Defendants claim to have made additional requests for Sun Media to identify its asserted trade secrets, both before and after Sun Media obtained a protective order on November 20, 2006. Defs.' Br. at 17. On December 21, 2006, Sun Media provided the following supplemental response to Defendants' request that it specifically identify the trade secrets that were allegedly disclosed to Defendants:

> Sun Media objects to this Interrogatory to the extent it requests privileged [information and] on the basis that the information being requested is both proprietary and confidential material. Not-

---

clear statement as to matters outside of those specifically referenced.

**17.** Defendants assert the answer to the interrogatory was received in August 2006. Defs.' Br. at 17.

withstanding the foregoing, pursuant to a contractual agreement, [Sun Media] provided extensive consultative work to exhaustively develop the television market in certain regions, including the creation of proprietary mailing advertisements for KDSM. [Sun Media] agreed to provide confidential trade secret information in the course of its consultative work to [KDSM] for the performance of the marketing campaign for KDSM–TV. Such confidential trade secret information that [Sun Media] provided to KDSM includes the important proprietary materials and instructive oversight to KDSM's employees, including critical management techniques for the development of a successful revenue generating advertising campaign. Pursuant to a confidentiality agreement, Sun Media provided [KDSM] with proprietary materials including manuals providing advice, sales techniques, and marketing schedules which Sun Media believes to be in the possession of KDSM.

Defs.' App. at 423–24.

When defense counsel deposed James Tandy of Sun Media on April 16, 2007 on the issue of what trade secrets Sun Media was claiming, Tandy responded as follows:

Q. On paragraph 23 of the complaint, you say that KDSM "wrongfully utilized SunMedia's trade secrets and copyrighted materials in the second direct mail campaign without permission, knowledge, approval, or ratification of SunMedia." Can you tell me, sir, what trade secrets you're referring to in that paragraph?

A. We have discussed the copyrights, and you have in your hands what are copyrights, and I look at the copyrights as a flow or a rhythm of our sequence. In order to accomplish that rhythm, the trade secrets, much attuned to what a producer does in music, are required to then accomplish the full sequence of events.

Q. So you're saying that the trade secret is some type of rhythm of sequence? Is that what you're saying, sir?

A. No, no. I'm saying that the trade secrets are the needs and the uses to accomplish the rhythm of the sequence.

Q. What do you mean by needs and uses?

A. Well, if a note is written, the way to play it.

Q. Well, no, I'm—I don't want to speak theoretically. I want to speak specifically about the trade secrets that you revealed to KDSM that you say they wrongfully utilized. What trade secrets are those?

A. They utilized the number of homes to go to. They utilized the pricing. They utilized the time lines that we had provided, both in sales and in production and in promotion.

Q. Anything else?

A. Those secrets.

Q. Anything else?

A. There probably are more. If you would allow me, as I think of them, I would like to bring them in, but right now, those are the broad-based trade secrets that I see that they utilized.

Defs.' App. at 1294–96. Furthermore, when asked during a deposition on September 14, 2007, whether Sun Media "[gave] Sinclair any document of any kind that said this is a trade secret," Tandy responded, "None of our trade secrets are written down, Number 1; and Number 2, I freely gave it because I felt we were cov-

ered by our terms and conditions, so I never did identify verbal language as being trade secrets." *Id.* at 1318–19 ("Q. So you never told anyone at Sinclair, I'm about to say something to you. What I'm about to say is a trade secret? A. No, sir.").

On August 24, 2007, Sun Media provided yet another supplemental response to Defendants' interrogatory requesting that it identify with specificity the trade secrets purportedly provided to KDSM:

[W]hen Sun Media presents and installs its system as shown in the manuals, the sequence of events is very important. Various steps are guided by Sun Media to elicit a successful direct mail campaign. The first step taught by the Sun Media system is a detailed sales procedure setting up the market for selling TV advertisements while giving away print advertisements as added incentives to potential clients. The system teaches how to price the TV packages and how to present those packages by presenting a cost/revenue summary. A calendar is provided to the station reflecting the precise scheduling of events for the sales promotion including the kickoff, sales deadline, the art deadline, the mailing deadlines and the contest timeframes. The second step involves the promotion of the advertisement campaign with the station's sales personnel and the prospective advertisers. After the station is onboard with the sequence, Sun Media begin [sic] instructing the sales arm of the station through an accelerated prospecting session. Sun Media teach [sic] the sales people that they have to take three things with them on a sales presentation: a direct mail piece, a sales presentation (either provided through flip charts or a power point presentation), and a "leave behind" developed for the individual markets. The direct mail piece is historically a copyright work prepared for a similar campaign. The sales presentation is developed for their individual markets to show the name, contest details, the fact that the print is free when they buy TV, a value page, an insert page, and a closing or reserved participation page. After training the sales team, a kickoff meeting for invited advertisers is held in front of many potential advertising clients invited by the station.

The Sun Media system step three involves creating an effective direct mail piece [which] will attract future advertisers. The Sun Media customer service people show the stations the *secrets* [sic] successful layouts to develop a final direct mail/promotion piece. At the same time, the Sun Media system teaches the stations how to develop a successful audience promotion campaign using vertical and horizontal promotion. The proprietary timeline presented in the sales step is emphasized again to execute the promotion step through layout. The finished direct mail advertising piece is sent to the printer and binder based upon the timeframe. The final step involves mailing the finished product to specified target audiences. Sun Media will have presented to the stations a zip code list of their area by count, by city, and by zip codes and assist them in selecting a proper direct mail execution.

Id. at 426–28.[18]

The Court finds that Sun Media has provided little more than vague and unparticularized responses to the issue of *what* it

---

**18.** Despite the November 20, 2006 Protective Order on the issue, Sun Media did not indicate that its supplemental responses to Defendants' Interrogatories were "CONFIDEN-TIAL UNDER PROTECTIVE ORDER," as required by the Protective Order. *See* Clerk's No. 21.

believes constitutes a trade secret in this case. The closest the Court can find to a definitive response to the question is in Tandy's August 28, 2007 deposition, where Tandy identifies the following items as trade secrets: 1) "how to select the place to have the breakfast meeting";[19] 2) "[w]hat kind of door prize creates excitement";[20] 3) how to fill in the blank copyrighted invitation that is provided to clients;[21] 4) "why the dates [i.e., the dates for holding the kickoff breakfast meeting and the target date of sweeps, for example] were arrived at"; 5) "how to establish [the date for rough art or finished art deadlines]";[22] 6) "certain catch phrases ... [f]or instance, the market name";[23] 7) "pricing and value";[24] 8) "the value column";[25] and 9) "sales period" and "printing period."[26]

**19.** Tandy testified that this alleged trade secret comes into play when he verbally tells his clients about "[t]he type of facility, the location, all of the intricate knowledge that we've built up over the years [as to] what works as a good venue and what doesn't. I just mention a couple, that it shouldn't be in restaurants with hanging flower baskets, as an example. I go through quite a description of what this place needs to look like, what the facilities need to handle...."). Defs.' App. at 1200–01. Tandy also tells clients that the facility chosen needs "Easy access. Convenient parking. Good flow to the room. One door." *Id.* at 1201. To the extent that this alleged trade secret could be found to be intellectual property, the Court notes that Plaintiff specifically disavowed any right to claim intellectual property in "holding sales meetings involving meals and/or door prizes as a mean of making sales presentations" in the July 29, 2003 Letter.

**20.** When asked "what was the trade secret associated with the kind of door prize?," Tandy replied that he told clients that they needed "[a] prize that would invoke people to attend the meeting." Defs.' App. at 1206. Clients would then ask Tandy, "What can I get?" and Tandy would give them suggestions, such as, "[a] TV set is certainly good. Trips are always good." *Id.* at 1206–07.

**21.** Tandy testified: "Invitation: The next thing I have sent them that is copyrighted is the sales presentation. It is a blank template that requires filling in blanks which are both words and numbers. And I go through that page by page with every client, especially the first time, because the don't understand the words, nor the numbers, that go in there, and explain to them how to do that. Therefore, that trade secret is the why. Why the names, why the numbers." *Id.* at 1211.

**22.** Tandy testified that the trade secret regarding the finished and rough art date deadlines is "the combination of the ability to combine all the factors involved and get the direct mail piece in the market when promised." *Id.* at 1218.

**23.** Tandy testified that in this regard, he "talks to [clients] about what are their hot ZIP codes ... and I also guide them in selection of money, that if they're spending enough money, that that promotional effort could be redirected to a sales effort...." *Id.* at 1237.

**24.** Tandy testified that he tells clients "a going-in or bottom-line rate" and he tells them "how they should arrive at it. And that's why I consider it a trade secret, because I'm telling them how to arrive at it." *Id.* at 1243–44.

**25.** The following colloquy occurred regarding this asserted "trade secret":
"Q. So what else is a trade secret, in your mind?
A. Well, then the value column. They use a little term that's part of the free or what's included page. In KDSM's case, it's 150,-000 homes times .04 cents. If my math is correct, that's $6,000, and that shows free are included.
Q. So this is basically a selling point to the advertiser saying, you know, "We're doing this direct mail to 150,000 homes. It costs 4 cents to deliver this direct mail product, so that's a savings to you of $6,000"?
A. Well, that's not accurate but only because of a part of your compound sentence. First of all, what they have been given by me as a trade secret is the why and how. Why isn't it one cent? Why isn't it 10 cents? ... Why 4 cents?"
*Id.* at 1250–51.

**26.** Tandy testified that "[t]here certainly is a lot of information on how to—passed from

Sun Media does little to clarify Tandy's generic assertions regarding *what* trade secrets are at issue in this litigation in its resistance to Defendants' Motion for Summary Judgment. Sun Media states that "Defendants and other Sinclair stations executed several contracts specifically identifying Sun Media's trade secrets." Pl.'s Resistance at 16. Sun Media cites to several documents in support of this assertion, however none of the cited documents shed additional light on the issue. For example, Sun Media cites its contract with KDSM, which provides that KDSM "hereby acknowledge that any marketing, sales, promotional or production information, manuals, customer lists, artwork, methods of operation or material it may acquire from [Sun Media] in the performance of or in connection with or as a result of this Agreement are [Sun Media's] trade secrets." Defs.' App. at 94. Plaintiff cannot, however, use the confidentiality clause in the KDSM contract to turn items into trade secrets that simply are not trade secrets under applicable law. Indeed, to establish a claim of misappropriation of trade secrets, Sun Media bears the burden of proving by a preponderance of the evidence: 1) the existence of a trade secret; 2) acquisition of the trade secret as the result of a confidential relationship; and 3) unauthorized use of the secret. *Lemmon v. Hendrickson*, 559 N.W.2d 278, 279 (Iowa 1997); *see also E.W. Bliss Co. v. Struthers–Dunn, Inc.*, 408 F.2d 1108, 1112 (8th Cir.1969). To satisfy this burden, Sun Media cannot rely on generic categories or assertions, but rather must assert *specific* allegations that it possessed information that meets the definition of trade secret under IUTSA, and must proffer evidence that Defendants actually received the trade secret and improperly used it.

Regardless of the apparently extensive list of trade secrets that Tandy believes Defendants misappropriated, Sun Media has defended only one in its resistance to Defendants' Motion for Summary Judgment, that is "Sun Media's proprietary method for laying out mailers." *See* Pl.'s Resistance at 16 ("While many Sun Media trade secrets existed in 2002 and were disclosed to Defendants, it is enough for purposes of this motion to discuss only one such trade secret...."). Thus, the Court must conclude that the only trade secret claim that could potentially survive summary judgment is the one asserted. Where, as here, Defendants have proffered both evidence and argument that none of Plaintiff's vaguely asserted "trade secrets" qualify as trade secrets under IUTSA, Sun Media "cannot simply rest on [its] laurels and proclaim summary judgment inappropriate. Rather [it] must come forward with some actual evidence, supported by the record in the case, showing a genuine issue for trial." *Atwood v. Vilsack*, 338 F.Supp.2d 985, 1004 (S.D.Iowa 2004); *see also VFD Consulting, Inc. v. 21st Servs.*, 425 F.Supp.2d 1037, 1048 n. 6 ("[N]ow that Defendants have moved for summary judgment, Plaintiff is *obligated* to identify its alleged trade secret with particularity. If Plaintiff cannot do so, Defendants are entitled to summary judgment."). Indeed, Federal Rule of Civil Procedure 56(e)(2) provides: "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate,

our customer service people and our art people on the specifics of developing the direct

mail piece." *Id.* at 1251.

be entered against that party." To the extent that Sun Media wishes to pursue various claims of misappropriation of trade secrets against Defendants, then, it is up to Sun Media to clearly identify and support with record citations the existence of each asserted trade secret. *See Lemmon,* 559 N.W.2d at 279 (placing burden on Plaintiff to establish the "existence of a trade secret"); *see also St. Jude Med., Inc. v. Lifecare Intern., Inc.,* 250 F.3d 587, 595 (8th Cir.2001) ("If the party with the burden of proof at trial is unable to present evidence to establish an essential element of that party's claim, summary judgment on the claim is appropriate because 'a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548)); *Lahey v. Contra Costa County Dept. of Children and Family Servs.,* No. C01–1075MJJ, 2004 WL 2055716, at *15 (N.D.Cal. Sept.2, 2004) ("In opposing Defendants' motions, Plaintiffs have failed to "set forth specific facts showing that there is a genuine issue for trial" but instead rely on the repetition of general allegations in the Complaint. Having failed at this basic task, the Court is not required to 'mine the full record for triable issues of fact.'" (quoting *Schneider v. TRW, Inc.,* 938 F.2d 986, 990–91 n. 2 (9th Cir.1991))). Accordingly, the Court turns to the question of whether Sun Media has proffered sufficient evidence to create a genuine issue of material fact on the question of whether Defendants misappropriated its "proprietary method for laying out mailers."

### 1. *Is Sun Media's method of laying out mailers a "trade secret"?*

The first question the Court must address is whether Sun Media's method for laying out mailers constitutes a trade secret. IUTSA defines a "trade secret" as follows:

> "Trade secret" means information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:
>
> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4). The Iowa Supreme Court has specifically adopted Restatement (Third) of Unfair Competition as providing the appropriate scope of § 550.2(4):

> A trade secret can consist of a formula, pattern, compilation of data, computer program, device, method, technique, process, or other form or embodiment of economically valuable information. A trade secret can relate to technical matters such as the composition or design of a product, a method of manufacture, or the know-how necessary to perform a particular operation or service. A trade secret can also relate to other aspects of business operations such as pricing and marketing techniques or the identity and requirements of customers.

*Cemen Tech, Inc. v. Three D. Indus., L.L.C.,* 753 N.W.2d 1, 7 (Iowa 2008) (quoting Restatement (Third) of Unfair Competition § 39 cmt. d (1995)).

Whether particular information constitutes a trade secret is "a mixed question of law and fact." *Economy Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641, 648 (Iowa 1995). "The 'legal part of the question' is whether the information in question 'could constitute a trade secret

under the first part of the definition of trade secret in § 550.2(4)." *Interbake Foods, L.L.C. v. Tomasiello,* 461 F.Supp.2d 943, 964 (N.D.Iowa 2006) (quoting Economy Roofing, 538 N.W.2d at 648). "The 'fact part of the question,' on the other hand, arises from the remaining part of the statutory definition found in subdivisions (a) and (b) of § 550.2(4)." *Id.* (quoting *Economy Roofing,* 538 N.W.2d at 648).

As to the legal part of the question, the Court finds that Sun Media's claimed "method" of laying out mailers fits the statutory list of "trade secrets" as defined in § 550.2(4), meaning that its claimed trade secret *"could* constitute a trade secret" under IUTSA. *See* Iowa Code § 550.2(4) (emphasis added) (defining "trade secret" as information taking one of at least eight forms: formula, pattern, compilation, program, device, *method,* technique, or process). With regard to the factual part of the question, the Court must determine whether Plaintiff has proffered sufficient evidence to demonstrate that its method of laying out mailers both derives independent economic value from not being generally known or readily ascertainable, and whether Sun Media took reasonable measures under the circumstances to maintain the secrecy of the method.

Before delving into the factual aspect of the analysis, the Court must first attempt to ascertain the boundaries of what Sun Media asserts is proprietary about its method of laying out mailers. This is, unfortunately, and as was the case with Plaintiff's asserted trade secrets in general, no easy task. Sun Media claims that the Declaration of James Tandy explains its proprietary mailer layout method, though Plaintiff generally cites a thirteen page span of the Declaration without pointing out any specifics. Pl.'s Resis-

tance Br. at 38. Tandy's Declaration states:

> While sales occur, Sun Media lays out a mock up book of the advertisers and the size of the advertisement to be placed in the direct mail piece. Sun Media also collects the advertisers and the size of the advertiser's advertisement and prepares a mock up book that shows a rough layout of the direct mail piece. Sun Media lays out the mock up book according to rough art that has been submitted and the advertisements to be placed in the direct mail piece. Sun Media provides the mock up book to its client for client approval. Sun Media advises the client to place the client's better advertisers towards the front of the mail piece to improve satisfaction of the client's better advertisers.

> Sun Media also provides the mock up book for assembling the layout of the advertisements in the mailers to the stations. Sun Media, as a service to its clients, determines the placement of the advertisements within the mailer and rearranges the advertisements as needed. Sun Media prepared the mock up book attached as Exhibit 2 during the direct mail campaign in 2002 for KDSM....

> Sun Media provides trade secret information to its clients regarding the layout of direct mail pieces. Sun Media informs its client how to properly lay out the advertisements found in the direct mail piece. Sun Media informs it clients that coupons should not be found back-to-back such that a recipient of the mailer can only use one coupon. Sun Media also advises its client that the advertisers who spend more money with the client should be placed in the front of the mail piece.

> As a part of its services, Sun Media also provides position changes of the layout of the advertisements. Sun Media's

changes increase an advertiser's satisfaction with the mailer and improves the likelihood that the advertiser will continue to advertise with the client. Sun Media provided such positioning changes to KDSM as shown in Exhibits 3, 4, 5, and 6. . . .

Sun Media also requests rough art from the advertisers of the direct mail piece. As Sun Media collects rough art, Sun Media's artists convert the rough art to finished art to be placed in the direct mail piece. Sun Media forwards the finished art to its client to obtain approval from the advertiser. . . .

After the advertiser approves the finished art, Sun Media prepares a mock up of the final version of the direct mail piece. Sun Media advises the client to confirm that coupons are not found on back-to-back pages and that direct competitors are not found on the same page. Sun Media requires final approval from its clients before printing the finished direct mail piece.

After confirming that the direct mail piece meets the client's approval, Sun Media prepares the direct mail piece for printing. Sun Media, through its years of experience, has learned the specifications of a direct mail piece that is effective with the targeted households. Sun Media determines the printing specifications and letter shop specifications and supplies such specifications to the printer. . . .

Following Sun Media's earlier prepared timeline, Sun Media provides the finalized direct mail piece to the printer to be printed and in homes at the given date. Printers do not assist with these time lines. Sun Media dictates the timing of the printing to coincide with the revenues and ratings goals. Sun Media claims trade secret interests in its method of accurately developing and executing a time line.

Pl.'s App. at 506–08. At hearing, when asked to clearly define the trade secrets at issue, Sun Media's counsel stated:

[I]n this mailer, you're going to have a 16–page mailer, you know how many different advertisements you can sell, you know which sizes they're going to be, for example. If you sell, for example, 12 half-page advertisements, you have to go to the next size up mailer. If you sell [ ] 30 coupon pages, you have to go up to the next size mailer. Knowing how to lay one of these things out so you know, here's a template, I'm following a template provided by Sun Media, it's go for a 16–page mailer, or a 36–page mailer, this is how many quarter-page advertisements I can expect to sell, this is how many half-page advertisements I have to sell. Where I put them, how much I charge for each one of these, the fact that some of these are worth more than others, how much more it is worth. These are the things that Mr. Tandy claims to be his trade secrets with respect to laying out one of these mailers.

The use of color on the pages to avoid undesirable white space, things of that nature, Your Honor you follow X, Y, Z, that's how we lay it out.

Hearing Tr. at 37–39.[27]

■ In assessing whether Plaintiff has demonstrated that it "derived economic value because the [method of laying out mailers was] unknown to, and not readily ascertainable by, a person who would profit from [its] disclosure and use," and that it "expended reasonable efforts under the

---

**27.** All references to the Hearing Transcript are to the Court's unedited RealTime transcript.

circumstances to maintain secrecy of [its method of laying out mailers]," several factors can be useful. *See* § 550.2(4); *205 Corp. v. Brandow*, 517 N.W.2d 548, 550 (Iowa 1994). Such factors include:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken ... to guard the secrecy of the information; (4) the value of the information [to the business and its competitors]; (5) the amount of effort or money expended ... in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Cemen Tech*, 753 N.W.2d at 7 (quoting *Kendall/Hunt Pub. Co. v. Rowe*, 424 N.W.2d 235, 246 (Iowa 1988)).

a. *Did Plaintiff derive economic value from its method of laying out mailers because the method was unknown to or not readily ascertainable by a person who would profit from its disclosure?*

To the extent that Plaintiff claims to have trade secrets in its method of laying out mailers, the factors Plaintiff claims to be proprietary are well-known throughout the advertising industry. For example, Plaintiff's claim that it taught Defendants that coupons should not be found back-to-back is plainly common-sense, and widely known throughout the advertising industry in general. *See, e.g.*, Defs.' App. at 1816 (containing the regulations for advertising in the Virginian–Pilot, stating that "care is taken to position the coupon ads to avoid printing coupons back-to-back"). Likewise, Plaintiff's advice that "better adver-

tisers [should be placed] toward the front of the mail piece" and that "direct competitors are not found on the same page" is not novel or original, but merely represents other aspects of advertising that are generally well-known. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) ("Information that is public knowledge or that is generally known in an industry cannot be a trade secret."). Even assuming that such factors were not well-known, Plaintiff cannot show that such "trade secrets" were unknown to Defendants specifically or were not otherwise readily ascertainable, and has pointed to no evidence in the record that would support such a conclusion. *See Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir.1995) (stating that in resisting a motion for summary judgment, a plaintiff "must point to concrete evidence in the record that supports each and every essential element of his case").

As to the value of Plaintiff's alleged trade secrets, Plaintiff baldly asserts that its "extensive trade secrets and specialized services [are] evidenced by the increasing number of Sinclair stations desiring Sun Media to conduct direct mail campaigns for them from 2001 to 2004." Pl.'s Resistance Br. at 40. More specifically, Plaintiff claims that the "economic value" portion of the trade secret definition is met because in 2001, Sun Media was employed to conduct a direct mail campaign for one lone market in Las Vegas, Nevada, but as time passed, it was engaged for more and more markets, eventually conducting direct mail campaigns "across 31 different markets by November of 2003." [28] *Id.* Such assertions simply are insufficient to demonstrate that Plaintiff's claimed trade

---

**28.** It is noteworthy that the Las Vegas contract was between Sun Media and Sinclair Media II, Inc., a separate entity that is not a party to this lawsuit. *See* Defs.' Statement of Material Facts ¶ 6.

secrets had "economic value." As noted previously, in resisting Defendants' motion for summary judgment, Plaintiff bears an affirmative obligation to "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). This can only be accomplished by pointing to affidavits, depositions, answers to interrogatories, and admissions on file that show specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *see also Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec,* 854 F.2d 1538, 1545 (9th Cir.1988) ("In the absence of specific facts, as opposed to allegations, showing the existence of a genuine issue for trial, a properly supported summary judgment motion should be granted."). Here, Plaintiff's assertion that economic value is shown merely because Defendants engaged it for more and more business does nothing to show that the trade secret alleged, i.e., the method of laying out mailers, was of economic value. This is so because Plaintiff's unsupported allegation cannot demonstrate a direct, or even a fairly implied link, between the asserted trade secret and the engagement of Sun Media for additional campaigns. Indeed, as Defendants pointed out at the hearing, a large portion of the service Sun Media provided to Sinclair and its affiliates was printing two hundred thousand pieces of direct mail and mailing them—"a substantial undertaking [that] costs a lot of money." Hr'g Tr. at 50.

   b.  *Did Plaintiff expend reasonable efforts under the circumstances to maintain the secrecy of its claimed trade secret in the method of laying out its mailers?*

Even assuming economic value of the claimed trade secrets, however, the Court cannot conclude that Plaintiff expended reasonable efforts under the circumstances to maintain the secrecy of its purported trade secrets. *See, e.g., Pioneer Hi–Bred Int'l v. Holden Found. Seeds, Inc.,* 35 F.3d 1226, 1235 (8th Cir.1994) (citing *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 475, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), for the proposition that "[f]undamental to the existence of a trade secret is that the matter be, in fact, secret"); *Coenco, Inc. v. Coenco Sales, Inc.,* 940 F.2d 1176, 1178–79 (8th Cir.1991) (same). The key to this factor is whether the efforts at maintaining secrecy were "reasonable under the circumstances." *See 205 Corp.,* 517 N.W.2d at 551. "The secrecy [of a claimed trade secret], however, need not be absolute. Reasonable precautions to protect the secrecy of a trade secret will suffice." *Pioneer Hi–Bred Int'l,* 35 F.3d at 1235. Here, Plaintiff asserts that it took entirely reasonable efforts under the circumstances because it attempted to maintain the confidentiality of its trade secrets by including a confidentiality clause in its contract with KDSM, which provided that any "marketing, sales, promotional or production information, manuals, customer lists, artwork, methods or operation or material ... are ... trade secrets and Client agrees not to divulge any of Sun Media's trade secrets to any third party ... [and that it] will not use any of [Sun Media's] trade secrets ... for any purpose whatsoever after the expiration of this Agreement." Defs.' Statement of Material Facts ¶ 8; Defs.' App. at 94. While a confidentiality agreement, such as the one between KDSM and Sun Media *can* be sufficient to establish that a party took reasonable measures to protect the secrecy of their trade secrets, merely having such a clause in a contract is not *necessarily* sufficiently reasonable under the circumstances in any given situation.

In the present case, none of Sun Media's claimed trade secrets were written. *See* Defs.' App. at 1319 (Tandy testifying that

"None of our trade secrets are written down."). It is equally clear that Tandy never told anyone at Sinclair or at KDSM, or at any other affiliate station for that matter, that any particular information he was conveying to them was a trade secret in Sun Media's view.[29] Given that Sun Media's claimed trade secrets are so amorphous as to be nearly incomprehensible, the Court must conclude that it would be inappropriate and, indeed, unjust, to find that the generic confidentiality clause employed by Sun Media was sufficient to put Defendants on notice that Sun Media claimed trade secret rights in everything from choosing door prizes to printing coupons. "[O]ne may not impose upon another, by a gratuitous and unilateral act a confidential relationship." *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 267 F.Supp. 726, 732 (S.D.Cal.1966) ("[A] confidence does not arise if the recipient has no notice of the confidential character of the disclosure.").

Moreover, while KDSM had a contract containing a confidentiality clause with Sun Media, Defendant Sinclair did not. The April 2003 Letter Agreement provided that Sinclair agreed to go forward with Sun Media as "the provider of the printing and distribution services for the direct mailpieces" for certain Sinclair affiliates in the fall of 2003. Defs.' App. at 399. It recognized that the parties "will not be signing a formal contract ... because we have been unable to agree on a number of the provisions to be contained in a contract," but agreed that the parties' "rights and obligations *with respect to the mechanics of performing the direct mail promotion* and the *financial responsibilities/payments associated therewith* shall be provided in a manner consistent" with that of prior agreements between Sun Media and Sinclair affiliates. The August 2003 Letter Agreement provides identical language with regard to the retention of Sun Media "as the provider of the printing and distribution services for the direct mailpieces" for the March/May 2004 time frame.[30] Plaintiff argues that these Letter

---

**29.** Tandy testified as follows:

Q. So you never told anyone at Sinclair, I'm about to say something to you. What I'm about to say is a trade secret?

A. No, sir.

Q. Okay. How was it that Sinclair would know when it is that you were verbalizing a trade secret as opposed to just verbalizing whatever you're verbalizing?

A. I come back to the ... point. They didn't know how to do this before I showed up ... or they would have done it themselves....

Q. Did you tell anyone at Sinclair at any time that I am orally giving you right now a trade secret which you are not to disclose to others?

A. Mr. Collins, you asked me that, and I said no, I didn't.

Q. Okay.

A. Do you want me to say no, I didn't, again?

Q. And the question is—the question is: How then would Sinclair have noticed that one particular thing you said to them was a trade secret as opposed to something else? ...

A. I can't answer how they would know.

Q. Okay. Because you would—you didn't tell them, correct? ...

A. Let me think about this a minute, if I ever identified anything that I absolutely didn't want revealed. I think I have to say no, I didn't....

Defs.' App. at 1318–21.

**30.** The July 30, 2003 letter from Sinclair to Sun Media provided that Sinclair would agree to utilize Sun Media "consistent with the manner and on the terms such service has been used previously, to sell direct mail/broadcast advertising purchases for the May 2004 sweeps period...." Defs.' App. at 408. This particular letter was a proposal and was never signed by both parties. Rather, it was formalized by the August 2003 Letter Agreement, which was signed by both parties. *Id.* at 413–14.

Agreements between the parties specifically incorporated the confidentiality clause in the KDSM contract.[31] However, the plain language of the Letter Agreements only incorporates rights and obligations relating to "the mechanics of performing the direct mail promotion" and the financial terms of prior agreements. The term "mechanics" is defined as "routine or basic methods, procedures, techniques, or details: *the mechanics of running an office; the mechanics of baseball.*" *See* dictionary.com, *available at* http://dictionary.reference.com/browse/mechanics; *see also Harrington v. Univ. of N. Iowa,* 726 N.W.2d 363, 368 (Iowa 2007) ("In searching for the meaning of contractual terms, we often resort to the dictionary to ascertain a term's common meaning."); *Fed. Land Bank of Omaha v. Bollin,* 408 N.W.2d 56, 60 (Iowa 1987) (stating the court interprets "the language of the contract in accordance with its plain and ordinary meaning"). In viewing the contract between KDSM and Sun Media, the Court would not characterize a confidentiality agreement as falling into the category of the "mechanics of performing [a] direct mail promotion." Rather, the mechanics, in the ordinary sense of that word, would appear to apply to such things as size, color, and quantity requirements, and other similar provisions, such as mail drops, etc. *See* Defs.' App. at 93–94.[32]

#### c. *Other trade secret considerations.*

The Court is cognizant of the fact that a trade secret " 'differs from other secret information in a business ... in that it is not simply information as to a single or ephemeral events in the conduct of the business....' " *Kendall/Hunt Pub. Co.,* 424 N.W.2d at 245 (quoting Restatement of Torts § 757 cmt. b, and finding that the asserted trade secret in that case was a secret, but not a *trade* secret because it was "not the sort of definite information to which we have previously afforded trade-secret protection," such as for chemical formulae, price lists, and customer lists). Here, Tandy admitted at deposition that during his sales pitch, he provides a great deal of information to prospective clients without the benefit of a confidentiality agreement, including: 1) "the concept behind linking direct mail to advertising"; 2) "the weight and the cooperative advertising nature and the quality of the particular mailing presentation"; 3) "how to get a breakfast meeting going by way of an invitation and sales call"; 4) that "it would be wise to have a script of some kind in order to pitch the business"; 5) "kind of an oral presentation as to what [Tandy] thinks the script should contain"; 6) "at least a glance or some idea of what the invitation should look like"; 7) and "a lot about the sequencing of events, kind of the way it makes sense to do it." Defs.' App. at 1288–90. In addition, Tandy admits that he leaves various materials, known as a "sales presentation packet" with prospective clients, again without benefit of a confidentiality agreement, including: 1) a "portion of the sales presentation"; 2) "a sample direct mail piece"; 3) "their copy of the cost-revenue summary"; 4) "a copy of the calendar"; 5) "a sales advertising re-

---

31. Apparently, the KDSM confidentiality clause was standard in Sun Media's contract with all its clients.

32. To the extent that Plaintiff argues that the Letter Agreements incorporated the Arkansas choice of law provision used in prior contracts between Sinclair affiliates and Sun Media in the fall of 2002, the same reasoning applies, i.e., such choice of law provision does not fall within the plain and ordinary meaning of the phrase "mechanics of performing [a] direct mail promotion." Regardless, Arkansas law on contract interpretation is largely the same as Iowa law, as is Arkansas trade secret law.

port from a different market"; and 6) "a CD." *Id.* at 1290–93. Sun Media asserts that its trade secrets are not these items provided to prospective clients—the prices or the brochures or the market determinations themselves—but rather that the trade secrets are the methods, i.e., the "how" and the "why" used to determine those prices, markets, layouts, and language to create an effective campaign. *See id.* at 1320 ("[T]he copyrighted vehicles that we hand people are the what. The trade secrets that we were constantly giving them are the how."). Indeed, Tandy claims that the "why" and the "how" is what makes his company unique, because while most aspects of the process can be independently determined by others,[33] Sun Media uses its "knowledge and experience" to combine those elements into a unique process.

On the record before it, the Court finds that Tandy's amorphous claims that he enjoys trade secret protection in the "why" and "how" is wholly insufficient to identify with particularity the trade secrets Plaintiff is claiming. Moreover, such concepts are simply too ephemeral to qualify as trade secrets. *See, e.g., Jostens, Inc. v. Nat'l Computer Sys., Inc.,* 318 N.W.2d 691, 699 (Minn.1982) ("Simply to assert a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status."); *Strategic Directions Group, Inc. v. Bristol–Myers Squibb Co.,* 293 F.3d 1062, 1065 (8th Cir.2002) ("Although [the defendant] paid [the plaintiff] for selecting a reduced number of questions from its battery of questions, 'the law of trade secrets will not protect talent or expertise, only secret information' ").

2. *Has Sun Media demonstrated that Defendants improperly used any of its trade secrets?*

■ Even assuming that Plaintiff's method of laying out mailers was a trade secret under Iowa law, and that Plaintiff has adequately shown that it conveyed those secrets to Defendants under the terms of a confidentiality agreement,[34] Plaintiff's claim of misappropriation of trade secrets would nonetheless fail because Plaintiff has not presented anything other than sheer speculation to support its conclusion that Defendants actually used any trade secret belonging to Sun Media without authorization. *See Lemmon,* 559 N.W.2d at 279. Of primary importance is the fact that Sun Media has not specifically shown, or even presented any argument that would support a conclusion, that either KDSM or Sinclair actually *used* its

---

**33.** For example, Tandy admitted at deposition that both a letter shop company and a printer, if given the date that a mailing needed to be "in-home" would be able to supply the required dates for submissions. Defs.' App. at 1230–31.

**34.** The Court sees no need to delve deeply into the question of whether Defendants actually acquired the purported trade secrets from Plaintiff. With regard to KDSM, Tandy testified that he must have revealed his purported trade secrets because he generally does so when working with clients. This is insufficient to establish that any particular trade secret was actually conveyed to KDSM. Moreover, with regard to Sinclair, Plaintiff gener-

ically alleges that KDSM revealed the trade secrets it acquired under its contract with Sun Media to Sinclair through telephone conferences and weekly meetings with Sinclair, and that Sinclair, in turn, either alone or jointly with KDSM, revealed such information to other Sinclair affiliates. Plaintiff points to absolutely no record evidence, however, in support of this allegation. Thus, the Court finds that Plaintiff's trade secret claims fail on the second essential element under *Lemmon* as well. *See Lemmon,* 559 N.W.2d at 279 (placing burden on Plaintiff to demonstrate the acquisition of the trade secret as the result of a confidential relationship).

claimed proprietary "method of laying out mailers," the only trade secret actually defended in the context of the present motion.

Indeed, at no point has Sun Media identified any *evidence,* save for Tandy's deposition testimony about his subjective beliefs, that KDSM or Sinclair ever used *any* purported trade secret. For instance, Tandy claimed in his August 28, 2007 deposition that "how to select the place to have the breakfast meeting" was a trade secret that he provided to KDSM. When questioned on the subject, however, the following colloquy ensued:

Q. So do you have any evidence that KDSM utilized that particular trade secret in any of the subsequent mailers that they did or any other campaign? . . .

A. There we go with the evidence thing again, What's evidence to you as an attorney may be different evidence to me. What I do know is that they were very much in praise of the kickoff, the situation, and the atmosphere. They did it again, so I think they did the exact same thing.

Q. But you don't know one way or another sitting here today; is that correct?

A. I wasn't at the meeting.

Q. Well, I'm asking you do you know of any evidence? Have you heard from anyone at KDSM that they used this particular trade secret on how to pick the proper breakfast venue?

A. I haven't asked them, but if did ask them that question, I believe the answer would be "Yes, we did exactly the same thing."

Q. Well, you could say that, I suppose, and that would be speculation on your part, but I'm asking about evidence. Do you have any person at KDSM that you could point to that utilized this particular trade secret of yours?

A. Mr. Collins, we can go at this all day. To me as a layman, that is evidence.

Q. Evidence that—your speculation is evidence?

A. No. Evidence that they liked the system. They copied everything we did. Why wouldn't they repeat that? It just seems to be common sense.

Q. Well, do you know where they held the breakfast meetings following the first campaign that you ran as a vendor for them?

A. No, sir.

Defs.' App. at 1203–05. Likewise, with regard to the claim that "What kind of door prize creates excitement" is a trade secret, Tandy claimed that his knowledge of how to choose an appropriate door prize was at issue, but was unable to identify how anyone used that knowledge after KDSM's contract with Sun Media had terminated. *Id.* at 1208–11. With regard to Tandy's claim that KDSM used the claimed trade secret of "why" certain dates were used, Tandy was only able to state that he had proof that KDSM used the same dates in 2003 that were used in 2002. Tandy, however, had previously admitted that he wasn't claiming trade secret protection in the use of the dates themselves, but in the way in which the dates were determined in the first instance, and he offered no testimony that the "why" was ever used by KDSM when it used the same dates in 2003 as those employed during the 2002 campaign. Furthermore, Tandy was unable to state whether KDSM had its breakfast meeting on the same day in 2003 as it did in 2002,

whether KDSM used the same final art deadline, whether KDSM used a letter shop company, who KDSM used to print their 2003 mailers, or whether KDSM used Sun Media's production schedule.[35] This type of bald assertion, that Defendants "must have" or "obviously" used Plaintiff's claimed trade secrets, is wholly insufficient to generate a genuine issue of material fact on the question of whether Defendants actually used any of Plaintiff's claimed trade secrets.

### C. Does Copyright Protection Extend to Plaintiff's Claimed "Sequence"?

Defendants next argue that Plaintiff has no copyright protection in its "sequence of events." Defs.' Br. at 28. Defendants point to Tandy's deposition testimony regarding his claimed copyrights, where he claims that he "own[s] the expressions that occur in my copyright, and especially the sequence in my manual." Defs.' App. at 29. Tandy also states at one point:

Q. And I guess with respect, for example, to Oklahoma City, what copyright was infringed upon, that you're aware of, in Oklahoma City?

A. My sequence.

Q. Well, your sequence isn't copyrighted.

A. Yes, it is.

Id. at 1313.

The Copyright Act provides copyright protection for "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). Copyright protection is specifically excluded, however, from certain categories:

In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle,

or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

Id. § 102(b).

Plaintiff appears to concede Defendants' argument in this regard, stating that "Sun Media does not claim that Sun Media's sequence is protected by copyright law." Pl.'s Resistance Br. at 47. Accordingly, the Court agrees that Plaintiff's claimed "sequence" is ineligible for copyright protection.

### D. Were Plaintiff's Works Registered with the Copyright Office Prior to Bringing Suit?

■ Under the Copyright Act, registration of a copyright, while not a prerequisite to having a protectable interest, is a jurisdictional prerequisite to the initiation of an infringement suit in federal court. Olan Mills, Inc. v. Linn Photo Co., 23 F.3d 1345, 1349 (8th Cir.1994); see 17 U.S.C. §§ 408(a) and 411. Derivative works also must be registered as a prerequisite to maintenance of a federal action. See Murray Hill Pub., Inc. v. ABC Comm'ns, Inc., 264 F.3d 622, 632 (6th Cir.2001) (adopting the rule that "a copyright owner must register its derivative works with the United States Copyright Office as a jurisdictional prerequisite to bringing a copyright infringement suit"); Well–Made Toy Mfg. Corp. v. Goffa Int'l Corp., 354 F.3d 112, 115 (2d Cir.2003) (concluding that "registration of a claim on an original work does not create subject matter jurisdiction with respect to a suit for infringement of the original's unregistered derivative"). A derivative work is defined by the Copyright Act as:

[A] work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fic-

---

**35.** When asked what "evidence" he had supporting his assertion that KDSM utilized Sun Media's production time lines wholesale, Tandy replied, "My belief." Defs.' App. at 1233.

tionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work'.

17 U.S.C. § 101; *see also Mulcahy v. Cheetah Learning LLC,* 386 F.3d 849, 852 (8th Cir.2004) ("A derivative work may itself be copyrighted if it has the requisite originality. However, 'the copyright is limited to the features that the derivative work adds to the original.'" (quoting *Pickett v. Prince,* 207 F.3d 402, 405 (7th Cir. 2000))); *L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486, 490 (2d Cir.1976) (stating that to be considered derivative, a secondary work must be substantially similar to the original work, yet sufficiently original to justify its own copyright).

Defendants point out, and Plaintiff concedes, that neither the KDSM Spring 2002 Mailer nor the KDSM Spring 2002 Presentation are registered with the Copyright Office. *See* Defs.' App. at 56–91, 100–126, 192–202; Pl.'s Resistance Br. at 48 ("Sun Media does not dispute that the KDSM Spring 2002 Mailer and the KDSM Spring 2002 Presentation have not been registered with the Copyright Office."). Both documents are "derivative works," as defined by the Copyright Act. Defendants argue that Plaintiff, therefore, cannot maintain suit for any action arising out of either the KDSM Spring 2002 Mailer or Presentation. Plaintiff, on the other hand, argues that it "does not allege that Defendants infringed either the KDSM Spring 2002 Mailer or the KDSM Spring 2002 Presentation," but rather that Defendants infringed the underlying works on which the derivative works were based.

■ Title 17, United States Code, § 103(b) provides that copyright protection in a derivative work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, *and does not imply any exclusive right in the preexisting material.*" In essence then, both parties are correct in regard to this issue. Defendants are correct that Plaintiff cannot claim infringement on any new material allegedly contributed by Sun Media to either the KDSM Spring 2002 Mailer or Presentation because such works were never registered with the Copyright Office. Plaintiff, however, is correct that, to the extent that it claims Defendants infringed upon previously registered works, even though such works may have been duplicated in the KDSM Spring 2002 Mailer or Presentation, it may still enjoy copyright protection on such previously registered material. *See Dam Things from Denmark v. Russ Berrie & Co., Inc.,* 290 F.3d 548, 563 (3d Cir.2002) (explaining that "[a]n author's right to protection of the derivative work only extends to the elements that he has added to the work; he cannot receive protection for the underlying work").

### E. *License Agreement*

■ Defendants argue that the License Agreement dated January 13, 2004 means that Sun Media "has no actionable claims for copyright infringement based upon any mailers produced by KDSM or any other Sinclair affiliate." Defs.' Br. at 32. The License Agreement, dated January 13, 2004, provides that Sinclair, Sinclair's affiliates, and Sun Media each grant the other the "perpetual non-exclusive right to place in any direct mail piece (or related product) ... any advertisement (or derivation thereof) which previously appeared in a mailer used by one of Sinclair's

[affiliates], with respect to which Sun Media was providing services, without violating any intellectual property right of either Sinclair or Sun Media." Defs.' App. at 416. The Court agrees with Plaintiff that the plain language of the License Agreement only prohibits Plaintiff from asserting copyright infringement arising out of a claim relating to "advertisements" and not from asserting copyright infringement claims on the expression of the mailers or direct mail pieces themselves.

## F. Are Plaintiff's Mailers, Presentations and Manuals Copyrightable?

■ To prevail on a copyright infringement claim, Plaintiff must demonstrate both that it owns a valid copyright and that Defendants infringed upon that right. *Moore v. Columbia Pictures Indus., Inc.*, 972 F.2d 939, 941 (8th Cir.1992). With regard to validity, the Copyright Act provides that a certificate of copyright registration constitutes "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Plaintiff has provided, along with its Second Amended Complaint, evidence that the following original works have been duly registered with the Copyright Office: Exhibit O, entitled "WTVY-TV Watch & Win," registration No. TX–5–539–359; Exhibit H, entitled "Laurel Marketing Back to School Sweepstakes Presentation," registration No. TX–5–001–318; and Exhibit M, entitled "Press Promotions Cable Operation Manual Manager Guide to Success," registration No. TX–4–889–941. *See* Defs.' App. Ex. O (pp. 276–308),[36] Ex.

H (pp. 178–91);[37] M (pp. 243–45).[38] Accordingly, Plaintiff is entitled to a rebuttable presumption that the copyrights listed are valid. *See Taylor Corp. v. Four Seasons Greetings, LLC*, 315 F.3d 1039, 1042 (8th Cir.2003).

■ The rebuttable presumption of validity to which Plaintiff is entitled includes a presumption that the works in question possess the requisite level of originality for copyright protection. *See Regents of the Univ. of Minnesota v. Applied Innovations, Inc.*, 685 F.Supp. 698, 707 (D.Minn. 1987) (citing 3 M. Nimmer, *Nimmer on Copyright* § 12.11[A] (1986)). The requirement that a work be original is the "touchstone of copyright protection," and indeed, " 'is *constitutionally mandated* for all works.' " *Feist Pub., Inc. v. Rural Tele. Serv. Co.*, 499 U.S. 340, 346, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (quoting Patterson & Joyce, *Monopolizing the Law: The Scope of Copyright Protection for Law Reports and Statutory Compilations*, 36 UCLA L.Rev. 719, 763 n. 155 (1989)). "Original, as the term is used in copyright, means only that the work was independently created ... and that it possesses at least some minimal degree of creativity." *Id.* at 345, 111 S.Ct. 1282. Because the "originality" standard is not burdensome, there is a "narrow category of works" that are considered insufficiently original to sustain a valid copyright. *Id.* at 359, 111 S.Ct. 1282.

Defendants contend that Plaintiff's work is a compilation, that is, "a work formed by the collection and assembling of preexisting materials or of data that are selected,

---

**36.** Plaintiff has not provided the Court with a copy of the original Certificate of Registration from the Copyright Office for Exhibit O. Rather, Plaintiff has provided a U.S. Copyright Office website search result as evidence of the copyright. *See* Clerk's No. 40.16.

**37.** Plaintiff has provided both the Certificate of Registration and the copyrighted work with regard to Exhibit H. Clerk's No. 40.9.

**38.** Plaintiff provided only the Certificate of Registration with regard to Exhibit M, and not the work itself. *See* Clerk's No. 40.14.

coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. "Because copyright law protects only expression, and not ideas or facts, copyright protection for a factual compilation is 'thin.'" *Schoolhouse, Inc. v. Anderson*, 275 F.3d 726, 728 (8th Cir.2002) (quoting *Feist*, 499 U.S. at 349, 111 S.Ct. 1282). Because of this "thin" protection, it takes "virtually 'extensive verbatim copying' to constitute infringement" of a compilation. *Id.* at 729 (citations omitted). Plaintiff counters Defendants' contention that its mailers [39] are compilations, stating simply and without any elaboration, that "[t]he artistic expression of the direct mail does not solely involve assembling preexisting materials." Pl.'s Resistance Br. at 51. The Court concludes, taking the evidence in the light most favorable to the Plaintiff, and for purposes of the present motion only, that Plaintiff's direct mailers, while mostly a compilation, are not wholly comprised of an arrangement of preexisting works and are, therefore, not compilations within the meaning of the Copyright Act.

"The test of originality is generally characterized as 'modest', 'minimal', and 'a low threshold' and as a practical matter requires 'little more than a prohibition of actual copying.'" *Tonka Corp. v. Tsaisun, Inc.*, No. 3–85–1885, 1986 WL 29980, at *12 (D.Minn. Nov.6, 1986) (citations omitted). "[D]efendants may establish copying by [P]laintiff by showing access and substantial similarity between plaintiff's work and the prior work." *Id.* (citing 2 Nimmer on Copyright § 12.11[A]). Defendants have not pointed the Court to any evidence that would tend to show that Plaintiff copied its copyrighted works from another source. Thus, the Court will find, for purposes of the present motion, that Plaintiff's copyrighted works are sufficiently original to qualify for copyright protection.[40]

### G. *Infringement*

Even presuming that Plaintiff has shown that it has a valid copyright which possesses the requisite level or originality, it is still incumbent upon Plaintiff to demonstrate that Defendants infringed thereon. *See Moore*, 972 F.2d at 941. 17 U.S.C. § 106 provides certain exclusive rights to the holder of a valid copyright:

> Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> (1) to reproduce the copyrighted work in copies or phonorecords;

---

**39.** While Defendants generally argue that none of Plaintiff's works possess the required level of originality, it appears that the argument regarding compilations really only pertains to the direct mailers.

**40.** The Court notes that it is not implying or holding that Plaintiff's copyrighted works are original as a matter of law. While the burden is admittedly minimal, the Court has found nothing in the record that would suggest that minimal level of originality has been satisfied, save for the Certificates of Registration. Indeed, the originality of the works in question is dubious at best, particularly with regard to the mailers themselves. Tandy's own declaration discusses how Sun Media "lays out a mock up book of the advertisers and the size of the advertisement to be placed in the direct mail piece." Pl.'s App. at 506. "Sun Media lays out the mock up book according to rough art that has been submitted and the advertisements to be placed in the direct mail piece." *Id.* While at one point Tandy explains that it employs an "art director," nowhere has Plaintiff indicated that any of the artwork employed in the copyrighted mailers was that of Sun Media. *See id.* at 510. And, Tandy specifically admits that KDSM's 2002 mailer was a "joint effort." *Id.* at 512. Compounding the problem, Plaintiff has made no effort to clarify how the copyrighted materials here at issue qualify as original.

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; [and]

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

17 U.S.C. § 106. In the present case, Plaintiff claims that "Defendants violated 17 U.S.C. § 501(a)(2) by using Plaintiff's copyrighted works to prepare unauthorized derivatives and subsequently published those derivatives (and the underlying preexisting material) to the public." Pl.'s Resistance Br. at 52; *see Mulcahy*, 386 F.3d at 852 ("One who violates the copyright owners' right to create derivative works is an infringer.").

Since Plaintiff has no direct evidence of copying, it must establish the following elements to establish its claim of infringement: 1) that Defendants had access to Plaintiff's copyrighted work; and 2) that there is a substantial similarity between the works. *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 120 (8th Cir. 1987). To demonstrate substantial similarity, a two-step process is employed:

> There must be substantial similarity "not only of the general ideas but of the expressions of those ideas as well." First, similarity of ideas is analyzed extrinsically, focusing on objective similarities in the details of the works. Second,

if there is substantial similarity in ideas, similarity of expression is evaluated using an intrinsic test depending on the response of the ordinary, reasonable person to the forms of expression.

*Id.* at 120 (citations omitted). Thus, under the *Hartman* test, the Court must first analyze whether the details of the works contain objective similarities. Objective similarities are determined by the Court as a matter of law. *See Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.1977). In applying the extrinsic test, the Court must "filter out and disregard the non-protectible elements in making its substantial similarity determination." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir.2002). If the works are found to contain objective similarities in the first step of the analysis, the Court must then "examine the works to ascertain if they are so dissimilar that ordinary, 'reasonable minds [can]not differ as to the absence of substantial similarity in expression.'" *Moore*, 972 F.2d at 945 (citing *Hartman*, 833 F.2d at 120 ("Infringement of expression occurs only when the total concept and feel of the works in question are substantially similar.")). Expert testimony may be relevant to the first step of the inquiry, but it is not relevant under the second step of the inquiry because the focus in the second step is on the similarity of expression from the perspective of an ordinary, reasonable person. *Hartman*, 833 F.2d at 120–21.

### 1. *Exhibit O (the mailer).*

Plaintiff's Second Amended Complaint alleges that Defendants' second, third, and fourth mailing advertisements, Exhibits E, F, and K, infringe the copyright Plaintiff holds in Exhibit O. Second Am. Compl. ¶¶ 56–58. Apparently, since the time the Second Amended Complaint was filed,

Plaintiff has also asserted that thirteen additional mailers infringe on the alleged copyright interest in Exhibit O. *See* Defs.' App. at 484–661 (Exhibits 49–61). After the close of discovery, Plaintiff identified an additional twenty-six mailers that it claims infringed on Exhibit O. *See* Defs.' App. at 662–981 (Exhibits 62–87).

■ When a district court has complete copies of both the copyrighted work and the allegedly infringing work, it is "in proper position to apply the substantial similarity test" articulated in *Hartman. Nelson v. PRN Prods., Inc.*, 873 F.2d 1141, 1143 (8th Cir.1989). In the present case, the Court has a photocopied version of Plaintiff's copyrighted work, Exhibit O, as well as copies of all allegedly infringing works produced by Defendants. Plaintiff contends, however, that the "Court does not have before it the necessary materials to conduct the required intrinsic evaluation of the infringing mailers" because "Defendants failed to introduce the originals of the infringing mailers that are in their possession." Pl.'s Resistance Br. at 54. Specifically, Plaintiff argues that the Court cannot make a reasonable comparison of the copyrighted work and the allegedly infringing works because the copies are not the same size, do not have the same weight and feel, and are not bound in the same way as the originals. However, as Defendants point out, Plaintiff has likewise not provided the Court with an original of Exhibit O, making comparison of the "look and feel" equally difficult due to Plaintiff's failing. Moreover, discovery in this case is closed, and nowhere in the record can the Court find a motion to compel, wherein Plaintiff requests that the Court order Defendants to produce the originals of the allegedly infringing mailers. If Plaintiff wanted to hinge its argument on the "look and feel" of the mailers, it had just as much of an obligation to ensure that it had the necessary documents for submission to the Court as Defendants. Indeed, it is Plaintiff who bears the burden of proving that Defendants' mailers infringed on Plaintiff's copyrighted materials. Regardless, the Court has color copies of both Exhibit O and the allegedly infringing mailers, and believes that these documents provide it with ample information to reach a conclusion.[41]

a. *Exhibit E.*

■ In attempting to discern *what* about Exhibit O [42] Plaintiff claims was in-

---

**41.** Contrary to Defendants' assertion that Plaintiff has never provided a color copy of Exhibit O, the version of Exhibit O attached to the Second Amended Complaint is in color in its electronic form. Notably, any hard copies provided to the Court are *not* in color.

**42.** Exhibit O has a front cover that has the call letters of the station in a box in the top left corner. The Words "Watch & Win!" appear in yellow in the middle top portion of the front page, while the words, "Check Us Out Sweepstakes" appear toward the bottom left hand side of the page. The words "Valuable Coupons Inside!" appear in the bottom right hand corner. Four people who, according to Tandy, are affiliated with the station's news broadcast are shown lounging near three automobiles on the front of the page, and four small advertisements appear along the right hand side of the page. In the lower left hand corner is the apparent place to put the name and address of the recipient. The dominant color on the front of the mailer is brown. After the front page, there are approximately twelve pages of advertisements. Each of these pages has either a full-page advertisement (pages 2, 4, 8, 10 and 13), two half-page advertisements (pages 6, 9, 11), four quarter-page advertisements (page 7), or multiple smaller advertisements interspersed with or appearing as clippable coupon advertisements (pages 3 and 10). The fifth page contains a half page advertisement with a coupon, and the "Official Rules" for the "WTVY News 4 Check Us Out Sweepstakes." The fourteenth page of the mailer is extremely similar to the front cover. The call letters for the television station appear in the upper left hand corner,

fringed, however, the Court faces the same problem it had with regard to Plaintiff's asserted trade secrets, that is, an utter lack of clarity and particularity on the question of what is "substantially similar" between Exhibit O and the allegedly infringing mailers. When questioned at deposition, Tandy points to the following vague "similarities" between Exhibit O and the allegedly infringing Exhibit E:

A. It's got news people on the front. It's got major prizes.... It's got invitations.... It's—I mean, the prizes are on here. The news people are on here. It looks like there's even a car on this one. It's kind of a bad copy. But the flow's the same. If I held it up to any layman, they would say they're identical. If we held the sheets up, they would say, "Yeah, they're the same...." The purpose of these front covers is to get the recipient to turn to the center section of the middle truck. That's the purpose of this front cover. And on both of them it says, "Valuable coupons inside...." These have television names on them. These have a contest. They're prepromoted by the tremendous promotion calendar, these television stations....

Q. Sure, but none of that is copyrighted. What's copyrighted are the creative expression that's on Exhibit O, and all I'm saying is tell me what about Exhibit O is the same, is a duplicate of the copyright that you have—

A. I just gave you several. do you want me to repeat them again?

Q. Well—

A. I gave you four or five. Watch and win. Valuable coupons. Call letters. Major prizes. News people. How many more do you want? ...

A. I see another similarity too, that the indicia is both the same place.

Q. The what?

A. The indicia.

Q. The indicia meaning, like, where you're going to mail it to?

A. Mm-hmm. Bottom left-hand corner....

Q. What else is going to be what you say a copyright violation?

"Watch & Win!" appears in the lower center of page, "Check Us Out Sweepstakes Thousands in Prizes!" appears at the top left of the page, and the same four individuals lounging near automobiles appear in the middle. To the right of the individuals appears language stating, "Win your choice of one of these vehicles!*" At the bottom right is a list of "Bonus Prizes." The fifteenth page shows a reprint of the ads that appeared on the front of the mailer, and to the right of each is a "check" which can be filled out with a consumer's personal information for an entry to win a particular listed prize. Between the ads and the "checks" are the words "Fill out, clip and mail your checks to WTVY in the enclosed envelope today!," printed from the bottom of the page to the top. The dominant colors on these interior "center truck" pages are brown with yellow accents. The next fourteen pages are again dedicated to advertisements, and include full page ads (pages 16, 17, 19, 20, 26, and 29), half-page ads (pages 21, 22, 23, and 27), quarter page ads (pages 18 and 28), two quarter page ads combined with a half-page ad (page 24), and two quarter page ads in the right column combined with 5 smaller ads in the left column (page 25). The 30th page of the mailer consists of green lettering across the top of the page with the words "MAIL TODAY & WIN! USE ATTACHED ENVELOPE AND MAIL YOUR ENTRIES TODAY! ALL WINNERS LOCAL." The 31st page appears to contain another "check" entry slip to be filled in by the consumer, and the 32nd page has the attached envelope which states, "Entries Inside Yes! I'm Watching."

A. Well, the KDSM learned from us how to do the content, front page and middle.

Q. But that's not copyright. We're talking about copyrighted violations, these—

A. It is part—it is absolutely part of the copyright.... Then I just told you. We just moved from the front page in a logical order. The idea when this is received in the mailbox, first of all, it is tabloid in size, not this size.

Q. Right.

A. It is printed on—

Q. But none of that's copyrightable, right, the size and the tabloid or the paper that you print it on? We're talking about the words and content, right?

A. It is copyrightable in its image and intent. You know it is. It's tabloid in size. It's glossy. It's full four-color.... [They use the words "Watch and Win Sweepstakes]." They have major prizes on it. They have news people on it. They have additional prizes. The indicia's the same. They were printed in the same size mailer. They were printed in four color. They were printed on glossy paper....

Q. Let's just go to the second page, and tell me what it is about the second page of Exhibit O that was copied onto the second page of Exhibit E.

A. ... Using advertising.

Q. And that's something that you believe you have a copyright protection to, the idea of using advertising?

A. No....

Q. What is borrowed from Exhibit O onto Exhibit E?

A. Form....

Q. Form. Meaning?

A. Meaning that they, like our form, used front and middle as the contest portion, what is basically the content of these pieces. And that in itself, having a contest as the content, makes it copyrightable....

Q. So tell me what else you want to say about the center section that you believe is a copyright violation?

A. Well, in addition to format, and that is using the front page and a middle as the station's content or contest, in this one you'll notice a copy of the return envelope. It says, "mail today and win".... You'll notice that not only did the station, KDSM, place the return envelope in the exact same position, but the wording is the same....

Q. And is there something unique or creative in particular that "mail today and win. Use attached envelope and mail your entries today"?

A. It's all part of the copyright. They're all our words, Mr. Collins.... It's an effective graphics piece that we invented and that we use and they used.

Q. It's an envelope, right, that you put the sweepstakes entry into? Is that correct?

A. It's an envelope that you cut those checks that we just spent some time.... The sizing fits these checks....

A. It's all identical. There are two interior pages.

Pl.'s App. at 435–55. In his Declaration, Tandy states:

The mailers identified as infringing contain similarities of ideas. The mailers share similar artwork that includes television personalities (television news people), a contesting page focusing on prizes and television promotion found within the center of the mailer, and advertisements for businesses. The materials include magazine style direct mail pieces that are tabloid in size printed in four color on glossy paper. The mailer's subject matter include promotion of a television station, promotion of businesses through advertisements and/or coupons, and the opportunity to win prizes or achieve great savings.

The direct mail pieces identified as infringing Sun Media's copyrights share many similarities. The advertisements are divided according to full page, half page, quarter page, and coupon sized advertisements. Each of the corresponding sized advertisements are the same dimensions for both Exhibit O and Exhibits E, F, and K of the Second Amended Complaint. The middle trucks of Exhibits O, E, F, and K contain a contest page. The first page of the middle truck of Exhibits O, E, and K show a repeated graphic that is similar to the cover of the respective mailer. Sweepstakes entries for Exhibits O, E, and K are found on the right hand side of the second page of the middle truck. The sweepstakes entries are found in the form of a check. All mailers are tabloid in size, four color, stitched, cut and bled, and printed on glossy paper. The front page and the middle truck pages are station promotions pages. These three pages are contest pages, the front and middle. The content of all the mailers includes a contest. Advertisements are placed on other pages. Exhibits O and E, F, and K provide the same promotional purposes. Exhibits O and E, F, and K consist of a front cover showing news personnel and encouraging people to watch the television station. Exhibits O, E, F, and K were sent to households to increase viewership for the television station while increasing business for the advertisers in the mailer.

Many similarities exist between Exhibit O and the additionally thirty nine (39) Sinclair stations' mailers as have been discussed above. Also, as mentioned previously, the mailers should be reviewed to examine all of the artistic expression and the similarities.

*Id.* at 513–14.

In evaluating Plaintiff's claims with respect to Exhibit E, the Court cannot conclude that there is substantial similarity of the general ideas and also of the expressions of those ideas, as required by the first step in the *Hartman* test. The Court notes the following similarities and dissimilarities:

- Tandy claims that both mailers have news people on the front cover. While Exhibit O shows four people lounging around vehicles, there is no indication whatsoever that those people are news personnel. Indeed, nowhere on the cover of Exhibit O does the word "news" appear, and nowhere on the cover of Exhibit O are the people identified. On Exhibit E, on the other hand, the entire bottom right hand corner of the page states in large letters, "Fox 17 News at 9 It's About Your Time." The entire bottom half of the page features what are clearly news personnel. "Cal Woods and Susy Robinette" are identified and the word "news" is clearly visible behind their pictures. There are images to the right of their pictures showing snapshots of each of them reporting from live locations. "Ryan Burchett"

appears immediately below that image, with the word "weather" behind him, and with images of maps and meteorological charts next to his photo. Below that is a photo of "Andy Garman," with the word "sports" behind his photo and images of him reporting and of athletes participating in sporting events. At the right of these images, taking up nearly one-quarter of the page, is an image of Tiffany O'Donnell, presumably the lead anchor of the news.

- Tandy claims that both mailers offer major prizes and additional "bonus prizes." On Exhibit O, there are ads for Southeast Eye Clinic, Odyssey Tours & Travels, Snapper Pro Equipment Co., Inc., and Ted's Jewelers, all along the right hand side. In the center of the page are three cars, apparently from Dothan Chrysler Plymouth Dodge. There is no indication that these particular advertisers are supplying the prizes that can be won in the sweepstakes on the front of Exhibit O. On the top half of the page of Exhibit E, however, there are three advertisements along the left side and three advertisements along the right side. Down the center, between those advertisements, are the words "Fox 17 Sweepstakes. Enter Watch & Win! Over $35,000 in Prizes." Each advertisement makes clear what can be won from that particular advertiser, including a $3,000 shopping spree from Southridge Mall, $2,500 in patio furniture from Backyard Outfitters, a $3,000 16 hp zero turn mower from Accel Small Engine, two $1,000 1–year family memberships to Aspen Athletic Clubs, three $1,000 gift certificates to Krueger's bp, and a $3,000 Empire cast iron fireplace stove from Turtle Bay Spas.

- Tandy claims that both exhibits have a car on the cover. Exhibit O has three vehicles on the cover displayed prominently in the center, whereas Exhibit E only has a partial image of a car shown in the "on location" imagery related to Cal Woods and Susy Robinette.

- Both exhibits use the words "Valuable Coupons Inside!" On Exhibit O, those words appear in large letters in the lower right hand corner, while in Exhibit E, they appear in much smaller letters in the lower left hand corner.

- Exhibit O says "Watch & Win!" Exhibit E says, "Enter Watch & Win! over $35,000 in Prizes." The location of both slogans is in the approximate top, center of the page.

- Both exhibits show a logo of the station being advertised. Exhibit O has the call letters and the channel in the upper left hand corner, while Exhibit E only has the station name both at the top and in the bottom right hand corner, with no call letters listed.

- The indicia on both pieces is in the same location.

- According to Plaintiff, both were printed in "tabloid size," glossy print, and full four color. The dominant coloring on Exhibit O is brown with yellow accents, while the dominant coloring on Exhibit E is blue with red accents.

- Both exhibits have a slightly varied duplicate of the front cover in the center of the mailer. Exhibit O has deleted the individual advertisers and focused the image exclusively on the three vehicles with the four people lounging near them. Exhibit E has also removed the individual advertisements, but has changed the orientation of the news personnel photos and made them larger. This page in Exhibit O states "Check Us Out Sweep-

stakes Thousands in Prizes!" It states that you can win "your choice of one of these vehicles!* " and lists "Bonus Prizes." Exhibit E only says, "It pays to watch . . . Fox 17 News at 9."

• Both exhibits have a page of "checks" to be mailed in for entry into the contests to win the various prizes. The checks appear along the right hand side of the page with the correspondent advertiser/prize provider listed on the left. The "checks" themselves are essentially forms for people to fill their contact information to be included in the drawing for the correspondent prize. Exhibit O's checks have the station logo in the upper left corner, the name "SouthTrust Bank" in the bottom left corner, the name of the prize in the upper right corner, and the words "Sweepstakes check only" in the lower right corner. Exhibit E's checks have the station logo in the bottom left corner, the name of the prize in the upper left corner, the name "Community Choice Credit Union" next to the logo in the bottom left corner, and the words "sweepstakes check only" in the top right corner. Printed from bottom to top in the middle of the page on Exhibit O are the words, "Fill out, clip and mail your checks to WTVY in the enclosed envelope today!" In the same location on Exhibit E are the words, "Fill out, clip & mail your checks to KDSM Fox 17 in the enclosed envelope today!" At the top of the page of "checks" on Exhibit E are the words "Over $35,000 in prizes! Sweepstakes.[43] Enter, Watch & Win!"

• The "Sweepstakes Official Rules" are at the bottom of the "checks" page in Exhibit E, whereas they are on an entirely separate page in Exhibit O.

▬ As documented above, there are some minor similarities between the two mailers. Viewed on the whole, however, these similarities are not "substantial," but rather reflect the types of similarities one would expect to see in any direct mailer received from any television station. Even to the extent that there are objectively discernable similarities between Exhibits O and E, such similarities are of "ideas" or other elements that are not copyrightable. *See* 17 U.S.C. § 102 ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation. . . ."); *Country Kids 'N City Slicks, Inc. v. Sheen,* 77 F.3d 1280, 1284 (10th Cir.1996) ("[L]iability for copyright infringement will attach only where protected elements of a copyrighted work are copied."). For example, the fact that both mailers use similar language advertising the respective sweepstakes, such as "Watch & Win," is not copyrightable. *See* 37 C.F.R. § 202.1(a) (expressly excluding from copyright protection "[w]ords and short phrases such as names, titles, and slogans, familiar symbols or designs"); *Perma Greetings, Inc. v. Russ Berrie & Co., Inc.,* 598 F.Supp. 445, 448 (E.D.Mo. 1984) ("Clichéd language, phrases and expressions conveying an idea that is typically expressed in a limited number of stereotypic fashions, [sic] are not subject to copyright protection."). Likewise, the use of blank forms, such as the "checks" in the mailers are not copyrightable. *See* 37 C.F.R. § 202.1 (excluding from copyright protection "[b]lank forms, such as time cards, graph paper, account books, diaries, bank checks, scorecards, address books, report forms, order forms and the like,

---

**43.** It is clear that in Exhibit E, the "repeat" of the cover page and the page of checks appear side by side, because the word "Sweepstakes" is spread across both pages.

which are designed for recording information and do not in themselves convey information)." The envelopes with the instruction to "Mail today and win!" are not copyrightable expressions. *See Magic Mktg., Inc. v. Mailing Servs. of Pittsburgh, Inc.*, 634 F.Supp. 769, 772 (W.D.Pa. 1986) (holding that envelopes with instructions or directions for use are not copyrightable). The size of a mailer chosen is not in itself copyrightable. *See CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 879 F.Supp. 132, 137 (D.Me.1994) (finding that the choice of a particular size mailer for direct mailings cannot be copyrighted under the theory that "when a particular topic permits only a limited number of ways to articulate it, copyrighting one of those versions will not protect it") (citing *Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678–79 (1st Cir.1967)).

While the Court believes its own objective, extrinsic analysis of the mailers is more than sufficient to find that Plaintiff's cannot demonstrate a substantial similarity of the general ideas or of the expressions of those ideas, the expert witness report of Marc Schlather lends credence to the Court's conclusion in this regard.[44] Schlather observes largely the same differences between the two mailers as the Court has recognized.[45] With regard to the cover of the mailers, Schlather emphasizes that the purpose of the cover of Exhibit E is to promote KDSM and, in particular, its news programming, while the purpose of Exhibit O is to promote the various advertisers shown. Defs.' App. at 990. Moreover, "approximately 50–60% of the cover of Exhibit E" is devoted to news program personnel and related graphics, while "approximately 50% of the cover of Exhibit O is devoted to photos of automobiles and unidentified persons leaning" on them. *Id.* at 991. Schlather points out that both mailers contain a center "double truck," but that Exhibit E shows considerably more design consideration, in that advertisements from prize sponsors match the size and vertical placement of the corresponding entry form for that particular sponsor's prize. *Id.* at 992. While Schlather points out numerous other dif-

---

**44.** On November 26, 2007, Plaintiff filed a Motion to Strike Defendants' Exhibit in Support of Motion for Summary Judgment. Clerk's No. 61. Defendants filed a resistance to Plaintiff's Motion to Strike on December 13, 2007. Clerk's No. 68. In its motion, Plaintiff requests that the Court strike Mr. Schlather's report from the record and decline to consider it in its ruling on Defendants' Motion for Summary Judgment. Clerk's No. 61. Plaintiff contends that Mr. Schlather is a non-lawyer who "draws inappropriate conclusions without adequate basis on experience or in fact to form a disfavored expert opinion." *Id.* at 1–2. Specifically, Plaintiff points to the fact that "Schlather provides infringement analysis of the exhibits attached to Sun Media's Second Amended Complaint to reach his conclusion that no direct evidence of copying exists between the mailers...." *Id.* at 2. Defendants resist Plaintiff's motion in this regard, and urge that Mr. Schlather has amply established his qualifications to render his opinions on the issues of trade secrets and copyright infringement. *See* Clerk's No. 68. The Court agrees with Defendants and finds that Plaintiff's objections to Mr. Schlather's report go to the weight to be given it and not to its admissibility. Moreover, since the present motion is one for summary judgment, the Court is well able to discern appropriate uses of Mr. Schlather's report from inappropriate uses. Accordingly, Plaintiff's Motion to Strike is DENIED. The Court notes, however, that it would rule the same even without consideration of Mr. Schlather's report.

**45.** The Court notes, however, that Mr. Schlather's report outlines numerous additional clearly observable differences between Plaintiff's copyrighted works and *all* allegedly infringing works. The Court has carefully reviewed Mr. Schlather's report with regard to its straightforward listing of the differences, and adopts his factual outline of those differences by reference.

ferences, he essentially concludes that the "myriad differences between Exhibit E and Exhibit O are clear, unmistakable and numerous," and that "[t]he few similarities are innocuous, with no discernable pattern beyond generic functional considerations or common industry practices in terms of printing, graphic design or promotion." *Id.* at 990–91. The Court agrees with Mr. Schlather's analysis.

Even assuming a general extrinsic similarity between the mailers in question, the differences between the mailers are so significant that it is simply not reasonable to think that "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal [of the two mailers] as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960). Indeed, to an ordinary observer, the dissimilarities between the mailers are immediately apparent, even assuming that both had the same overall weight and feel. As such, Plaintiff also cannot satisfy the second, intrinsic step of the two-step *Hartman* analysis, that is, Plaintiff cannot show that ordinary, reasonable persons could find a substantial similarity of expression. *See Moore,* 972 F.2d at 945 (citing *Hartman,* 833 F.2d at 120 ("Infringement of expression occurs only when the total concept and feel of the works in question are substantially similar.")).

b. *Other documents alleged to infringe on Exhibit O.*

Plaintiff's Second Amended Complaint alleges that Exhibits F and K also infringe on Exhibit O, and that thirty-nine other mailers produced by Sinclair affiliates infringe on Exhibit O. *See* Defs.' App. at

484–661 (Exhibits 49–87). Plaintiff offers absolutely no argument or allegations, nor does it state with particularity, the way in which any of those mailers are allegedly "substantially similar" to Exhibit O. With regard to Exhibits F and K, Plaintiff states only that they provide the "same promotional purposes" as Exhibit O, and that they "consist of a front cover showing news personnel and encouraging people to watch the television station." Pl.'s App. at 514. The only reference to the "substantial similarity" of any of the additional 39 mailers is Tandy's Declaration statement that "[m]any similarities exist between Exhibit O and the additional thirty nine (39) Sinclair stations' mailers as have been discussed above." *Id.*

Plaintiff's lack of particularity with regard to its allegations about Exhibits F, K and the 39 other mailers is, alone sufficient to warrant summary judgment in favor of Defendants. Indeed, with regard to the 39 additional mailers produced by "other" Sinclair affiliates, Plaintiff offers no evidence that such affiliates ever even had access to Exhibit O or a derivative thereof, short of the unsupported assertion that Sinclair had this information and passed it along to its affiliates. Moreover, the Court has reviewed each of the 39 mailers, along with Exhibits F and K, and finds that they are even more dissimilar to Exhibit O than was Exhibit E.[46] For example, Exhibit F's cover is largely like Exhibit E, though the graphics of the news personnel are larger and take up the vast majority of the page. *See* Defs.' App. at 151. There are no individual advertisements on the cover, and the only promotion of prizes on the front cover is where it states, "Look Inside to Win a Trip to Las Vegas." The center truck is wholly dissimilar to that of

---

**46.** Exhibit K is substantially similar to Exhibit E, and thus differs from Exhibit O in largely

the same ways as Exhibit E.

either Exhibit E or O, containing no "checks," no prizes other than the trip to Las Vegas, and no advertiser graphics. Exhibit 49, from Cape Girardeau, Missouri, focuses the cover almost exclusively on network programming, such as "NFL on Fox" and "Malcolm in the Middle." *Id.* at 484. It includes an opportunity to win a trip to Las Vegas, but the entry form, while in the middle of the mailer, is small and appears on a page also focusing on network programming, with ads for "Home Improvement," "That 70s Show," "King of the Hill," and "The Simpsons." *Id.* at 484, 487. Exhibit 68 has the entire front page filled with animated characters from "The Simpsons," and "King of the Hill," with the words "$aving$ Guide" printed across the top. *Id.* at 742. The only vague resemblance to Exhibit O is found in the phrase "Watch Listen and Win" used in the bottom right hand corner. *Id.* Exhibit 76 features two small children in Halloween costumes looking over a cauldron of cash, with the words "Big Savings Inside" and "Win $11,000 in Prizes Look Inside for Details" on a cover entitled "METROmonthly." *Id.* at 848. Frankly, other than the fact that each of the mailers offers recipients the opportunity to save with coupons and to win prizes, there are virtually *no* similarities to Exhibit O. Summary judgment in favor of Defendants is, therefore, appropriate, under both the intrinsic and the extrinsic portions of the *Hartman* test.[47]

### 2. *Exhibit H (the presentation).*

The Second Amended Complaint claims that the KDSM Presentation of 2003, Exhibit J, infringes the copyright Plaintiff holds in Exhibit H. Second Am. Compl. ¶ 59. With regard to the claimed similarities between Defendants' Exhibit J and Plaintiff's Exhibit H, Tandy stated in his Declaration only that: "Exhibit H and J share similar ideas [and] share similar subject matter in that both are directed towards advertising through direct mail and television." Pl.'s App. at 516. Tandy further states, "Both Exhibits H and J are adapted to be displayed in a presentation setting through either a power point presentation or some other form of presentation in a meeting to a large group of prospective advertisers or on an individual basis to a prospective advertiser." *Id.* Plaintiff's resistance merely states, "Exhibit H refers to Laurel Marketing and Exhibit J refers to KDSM. However, the two presentations are quite similar as many pages have substantially similar text." Pl.'s Resistance at 54.[48] Plaintiff's resistance points the Court to several pages of the presentations in its attempt to highlight the similarities between them,[49] which pages are generally reproduced in the chart below:[50]

---

**47.** The Court notes that listed herein is only a sampling of the differences between the copyrighted works and the allegedly infringing works. Mr. Schlather's report aptly identifies the differences in *all* mailers, which are too numerous to include in this Order.

**48.** Once again, Plaintiff's failure to identify the alleged similarities with particularity is, alone, fatal to maintenance of its claim.

**49.** Plaintiff cites only a page number of its own presentation, followed by a corresponding page number for Defendants' presentation. Plaintiff has made no effort to identify *what* is alleged to infringe, however.

**50.** There are some mild formatting differences between the Court's reproduction and the originals, due to space limitations.

| Plaintiff's Exhibit H | Defendants' Exhibit J |
|---|---|
| HOW IT WORKS<br>* On August 5, 1996, Laurel Cable's Back to School Sweepstakes will be delivered to almost 35,000 homes in Litchfield and Torrington.<br>* Coverage that puts your offer or information in the homes of almost 105,000 people.<br>* Laurel Cablevision will promote this mailer heavily <u>two weeks</u> before we begin drawing prize winners.<br>*Laurel Cablevision will start drawing winners on August 12, 1996 and each Monday thereafter for 4 weeks, letting area residents become winners.<br>* The **Back To School Sweepstakes** will continue for four weeks with prizes being offered each Monday.<br>WHERE DOES YOUR BUSINESS COME IN?<br><br>Defs.' App. at 183. | IDEA:<br>Be a part of a unique multi-media campaign.<br>* On approximately, April 16, the KDSM sweepstakes mailer will once again be delivered to over 150,000 homes in the viewing area. This will put your offer or information in the homes of 450,000 people.<br>* KDSM will promote this mailing two weeks prior to contesting.<br>* KDSM will start cashing checks on April 24, letting viewers become instant winners when they see/hear their names announced in the FOX 17 News at Nine, and respond within 17 minutes. The sweepstakes will run 7 days a week through May 21.<br>* Your only obligation is to run advertising on KDSM between now and April 28, 2003. With that investment, your business will be included in the mailer.<br><br>Defs.' App. at 207. |

| | |
|---|---|
| THE BEST PART<br>IT'S FREE!<br>Your coupon, or similar size ad, will be featured in the Laurel Cablevision **Back to School Sweepstakes** mailer to 35,000 households . . . FREE.<br><br>We will include your coupon, or ad, on a first-come basis, at no charge when you advertise on Laurel Cablevision.<br><br>Your only obligation is to run $1,500* in advertising on Laurel Cablevision between now and August 4, 1996.<br><br>* Space is limited on free coupon offer. Larger display ads require additional investment in local television advertising. To participate in this project, current advertisers' expenditures must exceed last year's total for the same time period.<br><br>Defs.' App. at 184. | BENEFITS:<br><br>* Your coupon, or similar size ad, can be featured in the KDSM sweepstakes mailer to over 150,000 households. . . FREE.<br>* All advertisers in KDSM's May Sweepstakes will have their offer featured on kdsm.com. This now brings a third medium to the mix which makes you investment all that more efficient.<br>* This promotion was proven in 2002 and central Iowa viewers will be looking for it again in 2003. Being a part of a proven campaign helps to assure that your investment is a smart one.<br><br>Defs.' App. at 208. |

### ADD UP THE BENEFITS

| Feature | Value | Cost |
|---|---|---|
| Advertising Schedule. . .. | $1,500 | $1,500 |
| Your Coupon, or Ad | $1,400 | FREE |
| Additional Support. . . . | (35,000 x .04) | |
| Marketing Campaign ($20,800) | $595.00 | FREE |
| *Direct Mail * Newspaper | (Your share) | |
| * Television * Radio | | |
| Camera Ready Art | $200.00 | FREE |
| Promotion Support. . . | $850.00 | FREE |
| $30,000 (Prizes & Cable) | (Your share) | |
| Multi-Media Campaign | $3,950 | $1,500 |

Now Deduct Your Co-Op/Vendor_____
Net Total Investment_____

Defs.' App. at 185

### ADD THE BENEFITS:

| Feature | Value | Cost |
|---|---|---|
| Advertising Schedule. . . . | $3,000 | $3,000 |
| Your Coupon, or Ad in mailer | $6,000 | $FREE |
| | (150,000 x 4) | |
| Camera Ready Art | $250 | $FREE |
| Promotional Support | $2,500 | $FREE |
| $200,000 (Prize Jackpot | (Your Share) | |
| Radio, TV and newspaper | | |
| Advertising on KDSM.com . . . | $500 | $FREE |
| Multi-Media Campaign | $12,500 | $3,000 |

Now Deduct Your Co-Op/_____
Net Total Investment_____

Defs.' App. at 209.

## DISPLAY ADS

All commercials must air on Laurel Cablevision between now and August 4, 1996.

| | | |
|---|---|---|
| $1,500 IN ON-AIR ADVERTISING | + | $1,500 in on-air advertising on [Laurel] plus free coupon in over 35,000 direct mail sweepstakes mailers. |
| $3,000 IN ON-AIR ADVERTISING | + | $3,000 in on-air advertising on [Laurel] plus free 1/4 page ad in over 35,000 direct mail sweepstakes mailers. |
| $4,500 IN ON-AIR ADVERTISING | + | $4,500 in on-air advertising on [Laurel] plus free half-page ad in over 35,000 direct mail sweepstakes mailers. |
| $6,000 IN ON-AIR ADVERTISING | + | $6,000 in on-air advertising on [Laurel] plus free full-page ad in over 35,000 direct mail sweepstakes mailers. [interior full page] |
| $7,200 IN ON-AIR ADVERTISING | + | $7,200 in on-air advertising on [Laurel] plus free full-page ad in over 35,000 direct mail sweepstakes mailers. [back cover] |

Defs.' App. at 189.

## MEDIA INVESTMENT:

All commercials must air on KDSM between now and April 28th, 2003.
Four color back page ad(s) add 25%

| | | |
|---|---|---|
| $3,000 in TV advertising | + | FREE coupon in over 150,000 direct mail sweepstakes mailers [4 X 5] |
| $6,000 in TV advertising | + | FREE 1/4 page ad in over 150,000 direct mail sweepstakes mailers [4 X 6] |
| $9,000 in TV advertising | + | FREE half page ad in over 150,000 direct mail sweepstakes mailers [9 X 6] |
| $15,000 in TV advertising | + | FREE full page ad in over 150,000 direct mail sweepstakes mailers [9 X 12] |
| $9,000 in TV advertising | + | FREE check ad in over 150,000 direct mail sweepstakes mailers [Check Sponsor] |

Defs.' App. at 212

| RESERVED PARTICIPATION | NEXT STEP |
|---|---|
| DATE_____ <br><br> This agreement is between Laurel Cablevision and _____. In return for guaranteed participation in the Laurel Cablevision Back To School Sweepstakes direct mail promotion, client and/or Agency agree to purchase cable television advertising. Due to the irreversible nature of print advertising, Client and/or Agency unconditionally assume an obligation for payment and said obligation cannot be cancelled by notification or otherwise. Cable television schedules and billing will be performed in accordance with applicable provisions of the Laurel Cablevision advertising rate card and standard contract. It is agreed that $_____, in addition to last year's expenditure of $_____ for the same time period, to total $_____ will be run in local television advertising on Laurel Cablevision by August 4, 1996. Acceptance of the foregoing agreement is hereby acknowledged by signing below. <br><br> June 3, 1996 <br> Rough/ Camera-Ready Art Deadline <br><br> _____ <br> Client and/or Agency <br><br> _____ <br> Laurel Cablevision <br><br> Defs.' App. at 191 | DATE____--____2003 <br> This agreement is between KDSM Fox 17 and _____. In return for guaranteed participation in the Fox 17 Sweepstakes direct mail promotion, client and/or agency agree to purchase television advertising. Due to the irreversible nature of print advertising, client and/or agency unconditionally assume and [sic] obligation for payment and said obligation cannot be cancelled by notification or otherwise. Television schedules and billing will be performed in accordance with applicable provisions of the KDSM rate card and standard contract. It is agreed that $_____, in addition to last year's expenditure of $_____will run in television advertising on KDSM between now and April 23, 2003. Acceptance of the foregoing agreement is hereby acknowledged by signing below. <br><br> _____ <br> Rough/ Camera-READY Art Deadline <br> (Mailer prints in 4-color process, Photographic scans extra.) <br><br> _____ <br> Client and/or Agency <br><br> _____ <br> KDSM Television <br><br> Defs.' App. at 213. |

■ While the Court recognizes that there are similarities between the two presentations, none of the similarities generically pointed out by Plaintiff are copyrightable similarities. Indeed, all five pages deal solely with the factual aspects of the promotion being run by the respective television station, or deal with the concept of incorporating direct mail with television advertising. Plaintiff concedes that the concept of combining direct mail and television advertising is not copyrightable. *See, e.g.,* July 2003 Letter Agreement ("I understand that in the future some or all of the television stations owned by subsidiaries of Sinclair Broadcast Group may engage without the assistance of Sun Media in the sale of advertising packages using a combination of broadcast and direct mail (which may include magazine style compilation of ads and promotions). This letter is to confirm that SunMedia does not believe that it owns the exclusive right to undertake this type of advertising sales and that Sinclair stations do not have any obligation to use the services of SunMedia to make these sales."). Indeed, there is no copyright protection for ideas, concepts, or principles, or even methods of operation, "regardless of the

form in which it is described, explained, illustrated, or embodied...." 17 U.S.C. § 102(b); *Mazer v. Stein,* 347 U.S. 201, 217–18, 74 S.Ct. 460, 98 L.Ed. 630 (1954). Likewise, there is no copyright protection for "fragmentary works and phrases" or for "forms of expression dictated solely by functional characteristics," because "such material does not exhibit the minimal level of creativity necessary to warrant copyright protection." *Regents of the Univ. of Minnesota,* 685 F.Supp. at 707 (citations omitted).

■ Moreover, the Court agrees with Defendants that permitting copyright protection to this type of information would be contrary to the copyright law doctrine of merger. The merger doctrine arises from a natural corollary to the concept that only the expression of ideas, and not ideas themselves, are copyrightable. That is, "copyright protection will be denied to even some expressions of ideas if the idea behind the expression is such that it can be expressed only in a very limited number of ways." *Toro Co. v. R & R Prods. Co.,* 787 F.2d 1208, 1212 (8th Cir.1986). "The doctrine is designed to prevent an author from monopolizing an idea merely by copyrighting a few expressions of it." *Id.* (citing *Morrissey,* 379 F.2d at 678–79). Here, copyright protection for Exhibit H would amount to a prohibition on virtually any television station explaining the process or method whereby advertisers can receive direct mail advertising when they purchase television advertising. Thus, copyright protection in this instance would equate to copyrighting an *idea* or a *concept,* since the expression of the idea or concept of combining direct mail and television advertising can only occur in a limited number of forms.

Plaintiff's assertion in the Second Amended Complaint, that Exhibit L, a Sinclair presentation, infringes the copyright interests Plaintiff holds in Exhibits H, is equally defective for the same reasons discussed in regard to Exhibit J. *See* Second Am. Compl. ¶ 60. Moreover, Plaintiff has offered absolutely no evidence or argument in support of its contention that Exhibit L infringes on Exhibit H, and its claim in this regard accordingly fails as a matter of law.

### 3. *Exhibit M (manual).*

Plaintiff's Second Amended Complaint alleges that Exhibit L infringes on Plaintiff's copyrighted Exhibit M. *See id.* ¶ 60. Plaintiff has presented evidence that it has a copyright on "Press Promotions Cable Operation Manual Manager Guide to Success." *See* Defs.' App. at 244. Exhibit M, both in Defendants' Appendix, and as attached to Plaintiff's Second Amended Complaint, however, is only the Certificate of Registration.[51] This fact alone warrants summary judgment in favor of Defendants on the claim, as Plaintiff has failed to provide the Court with the necessary documentation in support of its claim.

It appears that Plaintiff's solution to the failure to provide the Court with the original "Manager Guide to Success," is to request that the Court find that Exhibit L "draws heavily from Plaintiff's Revised 2002 Manager's Manual," found at Exhibit N. This effort fails for multiple reasons. First, there is no evidence that Exhibit N was ever registered with the Copyright Office. *See Olan Mills, Inc.,* 23 F.3d at 1349 (stating that registration is a required jurisdictional prerequisite to bringing a suit for infringement). Second, even as-

---

**51.** Exhibit C is identical to Exhibit M and, likewise, fails to attach the original copyrighted work. *See* Defs.' App. at 98; Clerk's No. 40.4 (Exhibit C attached to Second Amended Complaint).

suming that Exhibit N is intended to be a derivative work of Exhibit M, there is no way for the Court to make that comparison since the copyrighted work, Exhibit M, does not appear in the record. Finally, other than generic allegations that Exhibit L "draws heavily" from Exhibit N, Plaintiff points to only one identifiable similarity between the two documents. Pl.'s Resistance Br. at 55. Namely, Plaintiff points to a passage in Exhibit N which states that the promotion "will help both your clients AND YOU A) generate new business; B) get current clients to buy more often and C) get current clients to spend more per sale."[52] *Id.* at 55; Defs.' App. at 251. In Exhibit L, Defendants state:

Let's Talk About What you *WANT*

\* More $ $ $?!

\* More New Customers

\* Current Customers to Shop More Often

\* Customers to spend MORE per visit

HOW do businesses get these things to happen FAST?

ADVERTISING!

Defs.' App. at 231. Even were the language in the two exhibits deemed substantially similar, as was the case in regard to material in Exhibit H, this type of information from Exhibit N is not copyrightable under the doctrine of merger. Every advertiser in every medium wants to generate new business, increase consumption by current clients, and to get clients to spend more. Such is the fundamental nature and overarching purpose of advertising. Plaintiff's assertion that it can copyright these basic principles amounts to nothing more

than an attempt to copyright the idea itself.

### H. *Plaintiff's Breach of Contract Claim Against KDSM*

Plaintiff claims in Count II of its Second Amended Complaint that KDSM breached its agreement with Sun Media by wrongfully using Plaintiff's copyrighted works and trade secrets to produce subsequent works after the expiration of the contract between KDSM and Sun Media, in violation of that contract's confidentiality clause. As noted previously, the confidentiality clause at issue states:

Client hereby acknowledges that any marketing, sales, promotional or production information, manuals, customer lists, artwork, methods of operation or material it may acquire from [Sun Media] in the performance of or in connection with or as a result of this Agreement are [Sun Media] trade secrets and Client agrees not to divulge any of [Sun Media's] trade secrets to any third party whatsoever without [Sun Media's] written permission. Client acknowledges the ongoing nature of the business contemplated by the Agreement and agrees that it will not use any of [Sun Media's] trade secrets, trademarks, trade names or marks or symbols descriptive thereof for any purpose whatsoever after the expiration of this Agreement.

*Id.* at 94. Despite Plaintiff's allegation in the Complaint that KDSM breached the contract by wrongfully using its copyrighted works, Plaintiff appears to concede that such a claim is not viable, given that the

---

**52.** Plaintiff states in its resistance brief that "[m]any other similarities occur but the foregoing are believed sufficient to demonstrate that Plaintiff's claims are not without merit and are sufficient to establish, when viewed in the light most favorable to plaintiff, that infringement has occurred." Pl.'s Resistance Br. at 55. Plaintiff's argument in this regard utterly ignores, however, the fact that Plaintiff must identify specific and particular issues of material fact for trial. Pointing to only one potential issue of fact is wholly insufficient to defeat Defendants' motion for summary judgment, except possibly with regard to the one potential issue of fact asserted.

confidentiality clause discusses only "trade secrets, trademarks, trade names or marks and symbols," and not copyrights. *See* Pl.'s Resistance Br. at 55 ("Further, as discussed by Defendant, Sun Media's claim for breach of contract does not include any claim for copyright infringement.").

To succeed on a claim for breach of contract, Plaintiff must establish by a preponderance of the evidence the following: 1) that the parties were capable of contracting; 2) that a contract existed between the Plaintiff and KDSM; 3) the existence of consideration; 4) the terms of the contract; 5) that the Plaintiff performed what the contract required of it; 6) that KDSM breached the contract in some particular way; and 7) that the Plaintiff suffered damage as a result of KDSM's breach. *See Magnusson Agency v. Public Entity*, 560 N.W.2d 20, 25 (Iowa 1997).

KDSM contends that Plaintiff cannot demonstrate that KDSM breached the contract, and that even if it could, there is an enforceable liquidated damages clause in the contract limiting damages for breach of contract to $5,000.[53] Plaintiff argues that it can demonstrate that KDSM breached the contract. Specifically, Plaintiff claims that KDSM breached the contract by: 1) "the method in which KDSM conducted the direct mail campaign in the spring of 2003"; 2) "by divulging trade secrets from KDSM to Sinclair and other Sinclair stations through telephone conferences"; and 3) by underpaying Sun Media during the direct mail campaign conducted during the Spring of 2002. Pl.'s Resistance Br. at 56.

"A breach of a contract is a party's failure, without legal excuse, to perform any promise which forms a whole or a part of the contract." *Magnusson Agency*, 560 N.W.2d at 27 (citing 17A Am.Jur.2d, Contracts § 716, at 727). With regard to Plaintiff's claim that KDSM breached the contract by way of the "method" it used to conduct the direct mail campaign of 2003, the Court finds that the claim is without sufficient evidentiary support in the record to be sustained. Plaintiff has not indicated what "method" it is referring to, nor has Plaintiff pointed the Court to any record evidence that would support its claim. With regard to Plaintiff's claim that KDSM divulged trade secrets to Sinclair and Sinclair affiliates by way of telephone conferences, Plaintiff's claim also fails. First, as discussed extensively *supra*, Plaintiff has failed to establish the existence of any trade secrets. Second, assuming that Plaintiff did have trade secrets, it has offered nothing more than unsupported speculation to support its contention that KDSM divulged them to Sinclair or Sinclair affiliates during telephone conferences. Finally, the claim also cannot survive on Plaintiff's allegation that KDSM underpaid it for the 2002 campaign.[54] This allegation was not raised in Plaintiff's Second Amended Complaint, and indeed, was apparently raised for the first time in Plaintiff's Resistance to Defendants' Motion for Summary Judgment. Plaintiff has never sought leave to amend

---

**53.** Plaintiff makes absolutely no effort to refute KDSM's contention that the liquidated damages clause would limit damages to $5,000 if Plaintiff were successful on a breach of contract claim. Accordingly, the Court will discuss only the issue of whether KDSM breached the contract with Sun Media.

**54.** Plaintiff claims that its contract with KDSM required KDSM to report certain reve-

nues to it, upon which Sun Media earned a commission type fee. "Sun Media completely relied upon KDSM to correctly report the generated revenues. However, during the course of discovery, Sun Media alarmingly discovered that KDSM and other Sinclair stations falsely reported lower revenues generated than the revenues that were actually generated." Pl.'s Resistance Br. at 56.

the complaint to assert this as a basis for its claim, and accordingly, the argument is untimely. *See N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir.2004) ("[W]hile we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment.").[55]

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment (Clerk's No. 54) is GRANTED as to all counts of Plaintiff's Second Amended Complaint.[56]

IT IS SO ORDERED.

---

**55.** Additionally, Plaintiff has offered no evidence in support of a claim that it was underpaid. Plaintiff cites the deposition testimony of Ms. Kristi Peterson, asserting that she "testified that advertisers paid more than the minimum amount to obtain an advertisement in the mailer." Pl.'s Resistance Br. at 56. Plaintiff cites its own appendix pages 106–109, however, those pages do not even contain any deposition testimony. Moreover, Plaintiff has offered nothing other than a bald assertion that KDSM reported to Sun Media that its revenues were lower than they actually were, nor any documentary evidence showing actual or reported revenues.

**56.** In light of the Court's ruling on the Motion for Summary Judgment, Plaintiff's Motion in Limine to Exclude Expert Testimony (Clerk's No. 73) and Defendants' Motion in Limine to Prohibit Damages Evidence (Clerk's No. 77) are DENIED as moot.